**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**July 24, 2006**

**Charles R. Fulbruge III**
**Clerk**

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 05-41205
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

HEARNE INDEPENDENT SCHOOL DISTRICT,

Intervenor Plaintiff-Appellee,

versus

STATE OF TEXAS; ET AL,

Defendants,

STATE OF TEXAS; TEXAS EDUCATION AGENCY,

Defendants-Appellants,

versus

MUMFORD INDEPENDENT SCHOOL DISTRICT,

Intervenor Defendant-Appellant-Appellee,

PETE J., individually and in his capacity as Superintendent of
Mumford Independent School District,

Intervenor Defendant-Appellant.

_____

Appeals from the United States District Court
for the Eastern District of Texas

_____

Before JONES, Chief Judge, and DeMOSS and OWEN, Circuit Judges.

EDITH H. JONES, Chief Judge:

This case arises out of student transfers from one rural Texas school district to another. Before and after the transfers, both districts had a majority of racial minority students.[1] The United States and Hearne ISD, the Plaintiff district, contend that the transfers impermissibly impeded desegregation and violated a thirty-five-year-old desegregation decree against the Texas Education Agency. The district court ruled in favor of the Plaintiffs and enjoined the transfer only of white students (even though large numbers of black and Hispanic students have also continued to transfer out of Hearne). After carefully reviewing the record, we hold that the court had no basis for sanctioning the transferee district, Mumford, a non-party to the original court order. Further, there is no legal or factual basis for the court's finding of a reduction in desegregation caused by the transfers. Because the Plaintiffs are entitled to no relief under the desegregation decree, we REVERSE the judgment and VACATE the district court's injunction.

## I. BACKGROUND

In 1970, the United States brought suit in the Eastern District of Texas against various Texas school districts, the governing county boards of education of each such district and their respective officials, and the Texas Education Agency ("TEA")

---

[1] A school district with a student population comprised of more than fifty percent minority students is commonly referred to as a "majority-minority" district. For this purpose, the word "minority" includes African-American, Hispanic, and Asian.

to achieve meaningful school desegregation. Each of the school districts named as a defendant in the original suit was either an all-white district or an all-black district that had taken no steps to comply with the Supreme Court's desegregation precedent. The district court, Judge William Wayne Justice presiding, found that the named school districts were responsible for creating and maintaining dual school systems and that systemically, "the vestiges of racially segregated public education" had not been eliminated. Accordingly, Judge Justice entered Order 5281, a far-reaching desegregation decree applicable to the named school districts and the TEA, which directs funding to the State's public schools. United States v. Texas, 321 F. Supp. 1043 (E.D. Tex. 1970). The Order contains two parts, the first directed at desegregating the named school districts and the second directed at correcting systemic segregation. Specifically, with respect to transfers, the Order enjoined TEA and any person acting in concert with TEA

> from permitting, approving or supporting by any means:
> (1) The inter-district transfer of students within the state of Texas which will reduce or impede desegregation or which will reinforce, renew or encourage the continuation of acts and practices resulting in discriminatory treatment of students on the ground of race, color, or national origin . . . .

Id. at 1060. The Order was later modified by the district court, United States v. Texas, 330 F. Supp. 235 (E.D. Tex. 1971), and subsequently by the Fifth Circuit, United States v. Texas, 447 F.2d

3

441 (5th Cir. 1971), but the text of the transfer provision remained largely the same.

During the thirty-five years that have elapsed since the original entry of Order 5281, there have been eight decisions in which our Circuit has addressed questions regarding the validity and applicability of Order 5281,[2] and during this same thirty-five-year period, the racial composition of public schools in Texas has changed drastically. Today, Texas public school districts continue to expend considerable resources complying with TEA's directives pursuant to the now-antiquated Order, yet the State has not moved to terminate it. Because of the Order's dwindling relevance, only three disputes have arisen under it in the last ten years, and the case was administratively closed for three years before this matter was filed. Judge Justice, the judge presiding over the original dispute in 1970, has remained in charge of the case throughout, even though he is now on senior status.

The most recent litigation under Order 5281 has involved small rural school districts fighting over student population in

---

[2] See United States v. Texas, 447 F.2d 441 (5th Cir. 1971); United States v. Texas (San Felipe-Del Rio), 466 F.2d 518 (5th Cir. 1972); United States v. Texas (Wilmer-Hutchins), 508 F.2d 98 (5th Cir. 1975); Gregory-Portland Indep. Sch. Dist. v. Texas Educ. Agency, 576 F.2d 81 (5th Cir. 1978); United States v. Gregory-Portland Indep. Sch. Dist., 654 F.2d 989 (5th Cir. 1981); United States v. Texas (LULAC), 680 F.2d 356 (5th Cir. 1982); United States v. LULAC, 793 F.2d 636 (5th Cir. 1986); United States v. Texas (Goodrich), 158 F.3d 299 (5th Cir. 1998).

4

contests rooted more in resource allocation than racial injustice.[3] Texas has a liberal transfer policy wherein funding from TEA follows the student across district lines. See TEX. EDUC. CODE §§ 25.035-037. In this case, Hearne seeks to prevent flight from its schools and retain funding in the district. At trial, Hearne administrators testified that they were concerned about <u>all</u> student transfers, correctly valuing students of all races equally. By intervening into the case underlying Order 5281, however, Hearne can only legally complain about the transfer of <u>white</u> students; the district consequently argues that their voluntary departure has reduced desegregation in Hearne schools.

Hearne sued TEA, Mumford Independent School District, which received many Hearne transfers, and Mumford's superintendent Bienski. The United States, as Plaintiff to the original Order 5281 litigation, joined the case. The district court conducted a bench trial and ruled in favor of the Plaintiffs, enjoining Mumford from accepting any more white transfers — even of students who have been attending Mumford schools for many years — and prohibiting TEA

---

[3] The only noteworthy case within the last ten years, <u>United States v. Texas</u> (<u>Goodrich</u>), 158 F.3d 299 (5th Cir. 1998), involved a neighborhood's attempt to be annexed to a different school district. <u>Id.</u> at 303. The dispute's only connection with race and segregation came from the creative legal theories used to attempt to prevent a few neighborhood students from taking their funding with them to the other school district. The district court's order refusing the annexation on the basis of Order 5281 was reversed by this court.

from funding Mumford for those transfers. This court stayed the district court's remedy pending TEA's and Mumford's appeal.[4]

## II. DISCUSSION

### A. Jurisdiction

Mumford first asserts that the district court should not have exercised jurisdiction over this dispute through a reopening of the TEA litigation and Order 5281. Mumford argues that because Hearne is subject to a prior, separate desegregation order that originated in a different court, the court here erred in asserting jurisdiction. We disagree. The fact that Hearne was itself the defendant in another desegregation case years ago and remains subject to a consent decree arising from that suit has no bearing on the State's compliance with Order 5281. Accordingly, subject matter jurisdiction is proper.

Mumford also challenges the district court's reopening of an administratively closed case and its allowance of Hearne's motion to intervene to enforce Order 5281. Because a district court may reopen an administratively closed case sua sponte, Mire v. Full Spectrum Lending Inc., 389 F.3d 163, 167 (5th Cir. 2004), we find no abuse of discretion in the district court's timing and decision to reopen the case. Likewise, the court did not abuse its discretion in permitting Hearne to intervene, as Hearne challenged

---

[4] One draconian consequence of the district court's order would have been to require transfer students entering into their senior high school year at Mumford, who have completed nearly all of their education there as transfer students, to go to Hearne schools instead.

6

TEA's action under Order 5281, which is a still-effective decree. See Trans Chem. Ltd. v. China Nat. Mach. Import & Exp. Corp., 332 F.3d 815, 822 (5th Cir. 2003) (explaining that permissive intervention is reviewed for abuse of discretion).

Finally, Mumford contests the district court's exercise of jurisdiction against it, a non-party to the original suit, as an entity acting "in concert" with TEA to violate Order 5281. See FED. R. CIV. P. 65(D)) (confining district courts to injunctive relief against parties or those "in active concert or participation with them"). Because the court's judgment must be reversed on other grounds, we need not decide whether the district court erred in construing the scope of its Rule 65 authority on the facts presented, and assume arguendo Mumford acted "in concert" with TEA.[5]

## B. Merits

Order 5281, as occasionally modified,[6] prohibits the State from permitting or supporting in any way

> student transfers, between school districts, when the cumulative effect, in either the sending or receiving school or school district, will be to reduce or impede desegregation.

---

[5] The court's finding that Mumford acted "in concert" with TEA would be subject to doubt for a number of reasons. In particular, TEA administratively sanctioned Mumford for not complying with its "one percent guideline" regarding student transfers and for not accurately reporting hardship transfers. Further, in federal court, the parties have taken different legal positions.

[6] In Goodrich, we described Order 5281, with amendments, as the "Modified Order." See 158 F.3d at 301 & n.2. Here, we use the term Order 5281 synonymously with Goodrich's Modified Order, to conform to the parties' and the district court's terminology in this case.

7

United States v. Texas, 447 F.2d 441, 443 (5th Cir. 1971).  One "guideline" for enforcing this proscription instructs TEA not to approve transfers whose effect "will change the majority or minority percentage of the school population by more than one percent (1%) in either the home or the receiving district or the home or the receiving school."  Under the Order, the white student population is measured against the "minority" population, including black and all other minority students.

Neither Hearne nor Mumford was an original defendant school district subject to Order 5281.[7]  During the past decade, more or less, Hearne has lost student population of all races via transfers, dropouts, and changes of residence.  While Hearne's enrollment declined from nearly 1700 in 1991 to under 1200 in 2004, Mumford grew from a district of just fifty-seven students in 1991 to over four hundred in 2004.  Mumford expanded largely by receiving transfers, mostly from Hearne, and mostly of Hispanic and black students.  Notwithstanding the districts' changing populations, both districts have remained "majority-minority."

When analyzing this case, the district court stated repeatedly that the critical issue is whether TEA's funding to Mumford of white transfer students from Hearne violated Order 5281 because such transfers' cumulative effect reduced or impeded

_____

[7] Hearne, indeed, entered into a desegregation decree in another archaic case still technically pending in another Texas federal district court. Nearly twenty years ago, Hearne represented to that court that all vestiges of desegregation had been eliminated.

8

desegregation in Hearne. We cannot fully endorse this characterization. The Order itself required the court to consider the racial balance of both Hearne and Mumford as well as <u>all</u> the transfers and the resulting student body populations, taking into account Hispanic as well as black and white students. Contrary to the Order, however, the court skewed its analysis toward the complaining district alone and arbitrarily excluded Hispanics, the racial group that has grown considerably in both Hearne and Mumford (just as it has grown all over Texas). Moreover, the court's focus seems to have been misplaced on racial balancing for its own sake rather than on effectuating the more tailored remedies required in recent years by the Supreme Court and this court. The court should have been more mindful of <u>Goodrich</u>, where this court recited applicable Supreme Court cases and held that "since there is no reason why [Order 5281] must be interpreted to extend the district court's remedial jurisdiction beyond limits articulated by the Supreme Court, prudence and deference to the High Court strongly counsel enforcement of the Order consistent with rather than in the teeth of its pronouncements." <u>United States v. Texas</u> (<u>Goodrich</u>), 158 F.3d 299, 311-12 (5th Cir. 1998).

Wisely, however, the court declined to equate a violation of the one percent guideline with a violation of Order 5281. <u>Goodrich</u> disapproved, albeit in the context of school boundary changes rather than student transfers, prophylactic percentage tests that have little or no connection to the remedial facts

9

underlying Order 5281. Even as to student transfers, within the Order itself, a guideline is a guideline, not an inflexible command.[8]

Bearing in mind these initial observations, we analyze separately the appellate points of TEA and Mumford.

## 1. TEA

The district court enjoined TEA from funding all white transfers from Hearne to Mumford, even if those students had attended Mumford for their entire school careers. In doing so, the court disregarded that TEA had previously sanctioned Mumford for its Order 5281 reporting violations by refusing to fund any new transfers. For reasons originating in the adoption of automated reporting devices, TEA made a policy decision to recognize two levels of transfers. All students who had already transferred as of the 2000-2001 school year were considered "baseline" students. Students who had transferred for the 2001-2002 school year were considered "grandfathered" students. TEA has continued to fund baseline and grandfathered students, as well as siblings of baseline transfers, finding a disruption in funding to be contrary to desirable educational policy. The district court rejected TEA's balancing approach and ordered TEA to cease all funding for any

_____

[8] The one percent guideline may well be an unenforceable vestige of conditions long since substantially remedied. The guideline lives on, however, as a cause of voluminous continuous recordkeeping and monitoring by TEA and all Texas school districts. Because the State calculates that it would cost more to challenge the guideline than to enforce it, the State's limited education resources remained devoted to the highly questionable bureaucratic exercise of implementing the guideline.

10

white transfers — including the baseline and grandfathered transfers — from Hearne to Mumford.

Because "injunctive relief must not transcend the scope of the violation," a court enforcing Order 5281 against an original party thereto must find that transfers "reduce desegregation or reinforce the existence of a dual system" before enjoining such transfers. Lee v. Eufaula City Bd. of Educ., 573 F.2d 229, 234 (5th Cir. 1978). "In measuring the cumulative effect of a student transfer program on desegregation, the Court must do so from a qualitative viewpoint, without blind deference to an objective mathematical formula." Id. at 232; see also Davis v. Bd. of Sch. Comm'rs, 393 F.2d 690, 693 (5th Cir. 1968) (explaining that "school desegregation can first be measured quantitatively, using percentages as a rough rule of thumb, but ultimately must be measured qualitatively, judging whether schools are still identifiable" as one-race schools). If, after performing both quantitative and qualitative analysis, the court finds that there is a violation of a desegregation decree, it must fashion appropriately tailored equitable relief. In this case, the district court's quantitative and qualitative findings were clearly erroneous, and the district court abused its discretion in fashioning such a broad remedy.

The first step of a transfer analysis looks at the quantitative effect of the transfers on both school districts. Previous cases explain what this analysis entails. See, e.g., Lee

11

v. Lee County Bd. of Educ., 639 F.2d 1243, 1261 (5th Cir. 1981); Eufaula, 573 F.2d at 234. Although this court has "refused to sanction the use of strict quantitative or percentage analysis in measuring the effect of a transfer program on desegregation," it has noted "that the range of deviation may be significant in measuring qualitative segregative effect." Eufaula, 573 F.2d at 233 n.9. Specifically, "a transfer program which has the effect of increasing the black student population in a particular school from 90% to 100% may be more suspect than a corresponding 10% increase from 50% to 60%." Id. Another test comes from the Sixth Circuit: whether the "foreseeable and actual result of a transfer policy is to increase the racial identifiability of schools." Id. at 233 (quoting NAACP v. Lansing Bd. of Educ., 559 F.2d 1042, 1051 (6th Cir. 1977)).

Most important for present purposes, small changes in the racial composition of a district through transfers cannot justify mandatory interdistrict desegregation remedies. See Lee County, 639 F.2d at 1261. In Lee County, the white transfers out of a particular school caused the racial composition of the school to change from ninety-one percent black to ninety-six percent black. "This increment of change in the racial composition of a school seems unlikely to alter significantly general perceptions of a school's racial identity or the behavior of persons who rely on

12

such factors in determining whether or not to send their children to a particular school." Id.[9]

Contrary to the district court's finding, the numbers in this case do not prove that the transfers from Hearne to Mumford reduced desegregation or caused Hearne to transform into a one-race school. Of equal significance, the district court ignored the race-neutral impact that transfers of all races has had on Mumford.

Following the district court's emphasis, we focus on Hearne first. At their highest percentage in 2001-2002, 56.67 percent of students attending Hearne were African-American. The lowest percentage of African-American students was 50.71 percent in 1998-99.[10] The district court's exhaustive discussion of mathematical calculations, percentages and percentage points is rendered moot by this simple comparison, as this court has already explained that a change, because of transfers, in percentage of black students from fifty percent to sixty percent would be "less suspect." Eufaula, 573 F.2d at 233 n.9.

_____

[9] As will be seen infra, "perceptions alone cannot form the basis for federal court intervention"; actual segregative effect is needed to support a finding that transfers reduce desegregation. See Goodrich, 158 F.3d at 311.

[10] These percentages derive from Trial Exhibit 237, an exhibit the district court found reliable and used in its calculations. Trial Exhibit 237 presents data from 1996 to 2004. The highest percentage of white students attended Hearne in 1996-1997, when 23.50 percent of the student population was white. The lowest percentage occurred in 2003-2004, when 12.98 percent of the student population was white. Hearne's resident population of white students has also fallen, from a high of 26.18 percent in 1998-1999 to a low of 19.41 percent in 2003-2004.

13

The district court also erred because it examined only the impact of the transfers on the percentage of black and white students in Hearne, ignoring the substantial and growing portion of Hispanic students. A central purpose of desegregation decrees was to prevent, to the extent practicable and not attributable to demographic changes, the continued existence of one-race schools. See, e.g., Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 26, 91 S. Ct. 1267, 1281 (1971); Tasby v. Black Coal. to Maximize Educ., 771 F.2d 849, 851 n.3, 855 (5th Cir. 1985) (discussing concern over predominantly black schools in a school district where fifty percent of the students were black and twenty-three percent were Hispanic); see also Ross v. Houston Indep. Sch. Dist., 699 F.2d 218, 226 (5th Cir. 1983) ("[I]n seeking reduction in the number of one-race schools, the district court could not ignore diminished white enrollment in [the district] and substantial immigration of Hispanic students."). Hearne is, however, nowhere close to becoming a one-race school, as the largest percentage of black students since 1998 has been fifty-six percent.

Furthermore, even by grouping blacks and Hispanics together as one minority group, the change in population at Hearne would not be so significant as to imply a return to segregation. In the years 2001-2002 and 2003-2004, when the attendance of white

14

students reached its lowest point — approximately thirteen percent[11] — the resident population of white students was 22.11 percent and 19.41 percent, respectively.[12] These differences are simply not enough to mark a return to segregation as a result of State action through the transfer funding. See Lee County, 639 F.2d at 1261 (finding it unreasonable "to conclude that this small number of transfers effectively perpetuated the segregative effect of earlier actions"). Also noteworthy is that TEA cannot be held liable for a decline in Hearne's white student population caused by a decline in white residency within the district.

Accordingly, to the extent that the district court relied on a quantitative analysis to show that white transfers from Hearne to Mumford were "transforming the district into a predominantly African-American district when it would not otherwise be so," its findings are clearly erroneous. To be sure, Hearne's enrollment

---

[11] In 2001-2002, 165 of Hearne's 1267 students, or 13.02 percent, were white. In 2003-2004, 153 of Hearne's 1179 students, or 12.98 percent, were white.

[12] The district court performed an additional unnecessary calculation by determining what the "white enrollment of Hearne would have been if there were no white transfers to Mumford." This calculation omits the significant numbers of Hispanic and African-American students that also transferred from Hearne to Mumford. Under the district court's calculation and subsequent injunction, black and Hispanic students could freely transfer from Hearne to Mumford, but white students would not be allowed. Such an odd result appears to violate the rule that transfers be administered in a nondiscriminatory manner. See Lee v. Eufaula City Bd. of Educ., 573 F.2d 229, 232 n.6 (5th Cir. 1978) ("[A] ruling that only black students may transfer into the . . . school system would itself run afoul of Singleton, which clearly prohibits acceptance of transfers on a racially discriminatory basis.")(citing Singleton v. Jackson Mun. Separate Sch. Dist., 419 F.2d 1211, 1218-19 (5th Cir. 1969)). Further, even under the district court's "white transfers only" analysis, the largest net effect of the transfers is a mere 9.97 percentage points, from 22.99 percent to 13.02 percent. Even this numerical difference cannot be found to resegregate Hearne.

15

has declined for several reasons, including transfers out of the district. But Mumford's acceptance of transfer students of all races has produced no segregative effect in Hearne.

The district court's findings also fell short by failing to consider the impact of transfers on Mumford's racial makeup. Order 5281, as well as above-cited desegregation principles, required a holistic look at the transfer policy's impact. Unsurprisingly, perhaps, there has plainly been no adverse consequence. Mumford has accepted larger absolute numbers of minority transfers than white transfers. Mumford was and remains a majority-minority district. Its most recent racial composition was fourteen percent black, forty-one percent white and forty-five percent Hispanic. Mumford's growth must be explained by factors other than an institutional desire to move itself — or Hearne — toward one-race status.

The district court found, qualitatively, that "[t]he transfers from Hearne have resulted in members of Hearne and neighboring communities perceiving Hearne as 'basically a black school district,' comprising mainly or exclusively black students." Of course, "perceptions alone" cannot form the entirety of a qualitative analysis, Goodrich, 158 F.3d at 311. Moreover, the witnesses' perceptions were full of hearsay and illogical

16

conclusions.[13] Even if the testimony before the district court were reliable, the district court never established, as required by Goodrich, whether such perceptions arose from parents' private choices or State action in the form of TEA-funded transfers. See Goodrich, 158 F.3d at 310-11. Instead, the district court found that Hearne does not have unusual discipline problems, and apparently parents would thus have no reason to move or transfer their children from Hearne to Mumford. The proper qualitative analysis would acknowledge that Mumford has always accepted more black and Hispanic transfers than white transfers and has itself remained a majority-minority district. TEA's funding of transfers has had no significant net racial impact on either district.

In sum, the conclusory statements that Hearne is a "black" school, despite the fact that at no point in the relevant time period have black students comprised more than fifty-six percent of the student population, are not indicative of a resegregative effect in Hearne. As in Goodrich, "[b]ecause the district court's findings of segregative effects are too

---

[13] The district court relied upon, first, the testimony of Norris McDaniel, Hearne's former superintendent. McDaniel testified that the perception of the Hearne District is one of "just basically a black school district." He buttressed this conclusion by discussing a conversation he had with a woman who had just moved into the district and noticed that "there were a lot of black people in Hearne." The district court then accepted the testimony of principal Caroline Reed, who was concerned because she saw a lot of white kids playing Little League baseball in Hearne, but her school did not have many white faces. She further testified that her perception of a "predominantly black school" was one with a majority of African-American students. Finally, the district court relied upon the testimony of Hearne board member James Taylor. Taylor testified he perceived Hearne to be a predominantly black school, in large part because Hearne's sports teams were predominantly black.

17

speculative, not supported by the record, or are rooted in private conduct rather than state action, they are clearly erroneous and legally insufficient." Id. at 311.

Finally, even if the court's findings that the transfers had a resegregative impact were not clearly erroneous, the court's overbroad remedy would be an abuse of discretion. The district court ordered TEA to stop funding all white transfers from Hearne to Mumford, even if those students had attended Mumford for years. This remedy grossly exceeds any possible violation of the original desegregation order.

The facts found by the district court demonstrate that the white student population at Hearne declined to thirteen percent, while the black population stood at fifty-six percent. TEA has refused to fund any new transfers to Mumford as a result of Mumford's reporting violations and contends that any possible resegregative effect will be erased by attrition as the baselined students graduate or move.

We do not comment on the legal merit of TEA's chosen sanction for Mumford's administrative violations. The issue before us is whether the court's injunction is among those federal-court decrees that "exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation." Milliken v. Bradley, 433 U.S. 267, 282 (1977); see also Gen. Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 399, 102 S. Ct. 3141, 3154-55 (1982)

18

(holding that the remedial powers of the federal courts "could be exercised only on the basis of a violation of law and could extend no farther than required by the nature and extent of that violation"). The violation here, summed up by the district court and the Plaintiffs, is that the percentage of white students at one school district is declining, and thus "impeding desegregation," because those students are transferring to another majority-minority district. Yet all TEA did was continue to fund transfer students already attending the receiving district after it learned that the one percent guideline had been violated. Even if, contrary to the foregoing discussion, a violation of Order 5281 had occurred here, the magnitude of the violation is ambiguous, and the motivation of TEA utterly benign. These conditions may have justified a remedial order that would have deferred to TEA's solomonic solution. Instead, the district court's order threatened to inflict a harsh and immediate funding reduction on Mumford and to penalize many innocent students who would be abruptly forced into changing school districts.

We do not denigrate the importance of the State's compliance with Order 5281, as long as it is on the books. Nevertheless, the Order must be implemented, as we have stated, consistent with the Supreme Court's evolution in its approach to remedial judicial decrees. The district court's draconian remedy failed to follow these standards.

19

## 2. Mumford

In addition to enjoining TEA from funding the Hearne-to-Mumford transfers, the district court enjoined Mumford from accepting all white transfer students ("without legitimate hardship exemptions") from Hearne. The court held that Mumford acted "in concert" with TEA in violation of Order 5281 by accepting students whose transfers reduced or impeded desegregation in Hearne. As we have invalidated the district court's findings and remedial order concerning TEA, the injunction against Mumford cannot stand. Nevertheless, it is necessary to point out serious flaws in the district court's analysis lest there be a perception that Mumford has been let off the hook notwithstanding its own misconduct. Mumford may not be exposed to liability for violating an order to which it was not a party without evidence of Mumford's intentional acts of segregation. Because the district court did not, and from the facts could not, find that Mumford engaged in conduct intentionally designed to foster racial segregation or to interfere with desegregation in Hearne, the injunction against Mumford cannot stand.

Based on its finding that Mumford acted "in concert" with TEA to violate Order 5281, the district court held that Mumford's lack of racial or segregative motive was irrelevant so long as the effect of its conduct violated the Order. This was reversible error. This court has long stated that "a federal court cannot

20

impose liability on individual defendant school districts on the basis of a general inverse respondeat superior theory holding them presumptively responsible for actions of the state or another governmental entity." Lee County, 639 F.2d at 1256 (citing and discussing Milliken v. Bradley, 418 U.S. 717, 94 S. Ct. 3112 (1974)). "[N]o local district may be subjected to remedial orders based on past segregative or other constitutionally invidious local practices of which it has been condemned unheard." United States v. Texas (LULAC), 680 F.2d 356, 373 (5th Cir. 1982). Because Mumford was not a party defendant to the original litigation that resulted in Order 5281, it cannot be condemned for violating the Order without a finding that it intentionally engaged in segregative conduct.

Further, a finding that Mumford violated a prophylactic provision in Order 5281 is not an adequate substitute for proof of intentional segregative conduct. In United States v. Texas (Gregory-Portland), 654 F.2d 989 (5th Cir. 1981), this court reversed an order requiring busing of Mexican-American students throughout a school district in South Texas. Id. at 996. The district court had concluded that "[i]f TEA determines the existence of ethnically identifiable schools, it need show nothing further;" specifically, TEA was not "required to find discriminatory intent on the part of [the school district] before implementing" sanctions based on Order 5281. United States v. Texas, 498 F. Supp. 1356, 1366 (E.D. Tex. 1980). We reversed,

21

overruling the district court's reliance on imputed and presumptive discrimination. Gregory-Portland, 654 F.2d at 996. We invalidated a procedure whereby TEA could sanction school districts solely on the basis of a numerical trigger:

> [B]y the order of August 1973, the district court established TEA as its agent for purposes of combing the Texas school districts in search of ethnically disproportionate campuses. These the court defined as ones comprising student bodies more than 66 percent minority. On finding one, and without further hearing or inquiry into causation, TEA was to do as it did here: offer the district a choice between accepting a student assignment plan or plans devised by TEA to dilute minority attendance, or suffering the imposition of sanctions calculated to disestablish it. Relief from either could be had only by the district's proving its innocence of discriminatory intent in a single and faraway federal court.

Id. at 997. The procedure was fatally flawed, because "[t]o infer discriminatory intent from such slender factual data and act decisively upon that inference is to run a high risk of acting unjustly." Id. at 997. We concluded: "[T]he ultimate and dispositive issue is that of the intent with which an autonomous body, [the school district], acted in making student assignments." Id. at 999. It follows from these authorities that the district court erred by cursorily dismissing Mumford's lack of discriminatory intent as irrelevant.

There is, moreover, no direct evidence condemning Mumford. Mumford's "violation" of the one percent guideline found in Order 5281 and used as a trigger by TEA for further investigation is not indicative of intentional discrimination. The

22

Fifth Circuit has rejected bare numerical requirements in the context of transfers. See, e.g., Eufaula, 573 F.2d at 232 & n.6. And, as Gregory-Portland explained, discriminatory intent cannot be presumed from "such slender factual data." Gregory-Portland, 654 F.2d at 997. The facts surrounding the Hearne-to-Mumford transfers demonstrate why a numerical guideline is of so little import. Before it accepted transfer students, Mumford was a tiny school district with fewer than sixty students. Once it started accepting transfer students, parents of all races began to send their children to Mumford. The court's focus on white student transfers alone was misplaced, as Mumford has accepted students of all races whose parents evidently seek educational opportunities of a different nature than those that exist in Hearne.

The district court faulted the district because it gave incorrect data to TEA and encouraged parents to claim hardship exemptions to TEA's rigid numerical requirements. As stipulated, Mumford did not provide TEA with transfer data for several years. The district court found that this "pattern of fraudulent conduct . . . demonstrated a consistent and persistent willingness to circumvent the requirements of [Order] 5281 whenever possible." Yet the question is not whether Mumford complied with TEA directives; Mumford must have acted with discriminatory intent in accepting the transfers. See Gregory-Portland, 654 F.2d at 999. Mumford's mishandling of reporting requirements, without more, does not prove discriminatory intent. Accordingly, the district court

23

had no legal or factual basis to enjoin Mumford from accepting white transfer students.

## III. CONCLUSION

Though it is certainly possible that racial discrimination still exists with regard to the treatment of black students in Texas schools, no evidence of segregation or its vestiges was presented in the instant case. The battle between Hearne and Mumford is fought for transfer dollars rather than racial justice. For the reasons expressed above, the district court's application of the timeworn Order 5281 was in error. We therefore REVERSE the judgment of the district court, and VACATE its injunction against Mumford and TEA.

**REVERSED AND VACATED.**