REVISED JULY 11, 2008
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 24, 2008

Charles R. Fulbruge III
Clerk

No. 06-41347

SAMNORWOOD INDEPENDENT SCHOOL DISTRICT; HARROLD
INDEPENDENT SCHOOL DISTRICT

Movants-Appellants

v.

TEXAS EDUCATION AGENCY; STATE OF TEXAS

Defendants-Appellees

G.I. FORUM; LEAGUE OF UNITED LATIN AMERICAN CITIZENS

Intervenor Plaintiffs-Appellees

Appeal from the United States District Court
for the Eastern District of Texas

Before GARWOOD, GARZA, and BENAVIDES, Circuit Judges.

GARWOOD, Circuit Judge:

This case involves two independent school districts located in the Texas panhandle challenging whether a some thirty-six-year -old federal court desegregation order can properly be applied to them when they were not a party to the suit when the order was entered and have never been found to have discriminated against students since they voluntarily and completely desegregated in the 1960s.

Because we believe that the application of the modified order to these two districts is unwarranted under current school desegregation law, we reverse and render.

## FACTS AND PROCEEDINGS BELOW

In March 1970, the United States brought suit in the United States District Court for the Eastern District of Texas against numerous specified Texas school districts, their governing boards, their officials, the State of Texas, and the Texas Education Association ("TEA") in order to achieve meaningful school desegregation. United States v. State of Texas, 321 F. Supp. 1043 (E.D. Tex., Nov. 24, 1970); United States v. State of Texas, 330 F. Supp. 325 (E.D. Tex., May 11, 1971), affirmed in part, modified in part, 447 F.2d 441 (5th Cir. 1971) (affirming order of Nov. 24, 1970, modifying order of April 20, 1971). The district court found that the named school districts were responsible for maintaining a dual school system and TEA aided this effort by funding the segregated school districts. To redress this discrimination, the district court entered an order on November 24, 1970, modified August 9, 1973, that has governed various aspects of public education in the state of Texas since then.[1] The Modified Order provides, among other things, that:

> "[TEA] shall not permit, make arrangement for or give support of any kind to student transfers, between school districts, when the cumulative effect, in either the sending or receiving school or school district, will be to reduce or impede desegregation, or to reinforce, renew, or encourage the continuation of acts and practices resulting in discriminatory treatment of students on the grounds of race, color, or national origin."

---

[1] Hereinafter, the federal court order entered in this case, including its modifications, will be referred to as the "Modified Order."

This case, like much of the recent litigation under the Modified Order,[2] involves small rural independent school districts competing over students to keep their local schools financially viable. Samnorwood and Harrold Independent School Districts (together the "School Districts") are located in the Texas panhandle and each have a single campus that serves the district's entire study body, grades K-12. Samnorwood is in Collingsworth County, southeast of Amarillo, and Harrold is in Wilbarger County, east of the city of Vernon. Black students from Samnorwood attended a segregated school in an adjoining district until July 8, 1963, and Black students from Harrold attended a segregated school in an adjoining district until October, 4, 1965.[3] After those dates, all children attended school in each district without regard to race, color, or national origin. Both School Districts desegregated by a vote of their respective school boards well before the commencement of United States v. Texas, and neither was ever a party to a desegregation order or have ever been shown to have acted with segregative intent in accepting transfer students (or otherwise). During the 2002-2003 school year, Harrold's enrollment was 112 students, of whom 1% were Black, 31% were Hispanic, and 63% were non-Hispanic white. Samnorwood's enrollment for the same school year was 101 students, of whom 3% were Black, 20% were Hispanic, and 75% were non-Hispanic white.

Both School Districts depend heavily on transfer students for their economic viability. Each accepts transfer students regardless of the race or ethnicity of the student, and neither charges tuition to any transfer student.

---

[2] See United States v. Texas (Hearne), 457 F.3d 472 (5th Cir. 2006) (Hearne ISD brought suit against Mumford ISD claiming that by accepting transfers from its school, Mumford ISD was impermissibly impeding desegregation); United States v. Texas (Goodrich), 158 F.3d 299 (5th Cir. 1998) (involving a neighborhood's attempt to be annexed to a different school district).

[3] Hispanic residents in these two School Districts never attended segregated schools.

During the 2002-2003 school year, seventy-four percent of Samnorwood's students and "virtually all" of Harrold's students were transfers.

Under Texas law, any child eligible for enrollment may transfer from his home district to any other district if the receiving district and a custodial parent (or guardian) jointly approve and timely agree in writing. Tex. Educ. Code § 25.036. TEA annually distributes funds to Texas school districts based on the average daily attendance of enrolled students, whether the students reside in the district or have transferred from another district. Tex. Educ. Code §§ 7.055(b)(35), 42.005, 42.101. Other than allocating funding based on student enrollment, Texas law does not otherwise empower TEA to oversee student transfers. Nevertheless, the Modified Order requires TEA to monitor all student transfers and to refuse to fund transfers in certain circumstances.[4]

In order to comply with its obligations under the Modified Order, TEA requires each school district to inform TEA whenever it receives a transfer student. Prior to 2002, schools recorded transfer data on paper and submitted it to TEA, but in the spring of 2002, TEA implemented a new automated Student Transfer System ("STS") to track transfers. Under the new system, schools are still required to report transfers, but now they submit that information electronically using STS.[5] Once a student transfer is submitted using STS, TEA

---

[4] The Modified Order provides that: "[TEA] shall not approve transfers where the effect of such transfers will change the majority or minority percentage of the school population, based on average daily attendance in such districts by more than one percent (1%), in either the home or the receiving district or the home or receiving school." But, as the district court noted in its opinion below, "[f]or very small school districts (fewer than 300 students), including Harrold and Samnorwood, the tolerable percentage change in the diversity of the home and receiving districts due to transfers is now three percent (3%)." Mem. Op., July 24, 2006, at 2. In calculating the one or three percent threshold, all minority students are added together and that percentage (the "minority percentage") is compared to the percentage of non-Hispanic white students.

[5] TEA switched to the automated system in response to complaints from school superintendents regarding the length of time it took TEA to determine whether a transfer student was eligible for funding under the old paper system.

4

calculates whether the transfer has a "segregative effect."[6] Any transfer that exceeds the applicable one- or three-percent rule is deemed ineligible. STS operates in "real time," meaning that it maintains a current calculation of every school district's racial and ethnic demographics, so when a transfer student is entered into the system it calculates what effect that transfer has on the current minority percentage at the sending and receiving schools.[7] STS does not make a permanent record of whether transfers are deemed eligible when they are entered or of a school's minority percentage on any particular day so there is no way for TEA to use STS to verify whether a transfer was deemed eligible when it was entered.[8]

In order to monitor the cumulative enrollment, TEA also requires school districts to report student data to its Public Education Information Management System ("PEIMS") after each school year. See Tex. Educ. Code § 42.006. The PEIMS data allows TEA to compute the average daily attendance of each school district. At the end of the year, TEA reconciles the data from PEIMS with the data from STS to determine whether student transfers have caused a school's minority percentage to change by more than one or three percent in violation of section A(3)(b) of the Modified Order. If a school has accepted an ineligible transfer in a particular year, the school loses funding for the next year for each

---

[6] A transfer is determined to have segregative effect if it changes the sending or receiving school's minority percentage by more than one percent, three percent for small schools, and the transfer moves either school closer to being racially identifiable than it was before.

[7] A consequence of this real time calculation is that a student could be listed as an eligible transfer on the date he is entered into the system, but could later be listed as an ineligible transfer depending on later demographic shifts in the sending or receiving schools. TEA has attempted to remedy this issue by not penalizing a school for a transfer if it can prove that the transfer student was eligible for funding on the date he was entered into STS.

[8] The only way a school district could prove whether a student was eligible on the date he was entered into STS was to print the computer screen after entering the student into the system.

day that the ineligible student attended the school. If a school district fails to enter a transfer into STS, TEA treats that student as an ineligible transfer and the school loses funding for that student as well.

If a school district remains in violation after being notified by TEA that it has accepted an ineligible transfer, the Modified Order instructs TEA to escalate sanctions against the district. Section A(6) requires TEA to refuse to fund transfers that violate the order. Section A(7) requires TEA to suspend a school district's accreditation if it fails to correct the violation after a ten-day warning.

In this case, STS reported that Samnorwood exceeded the three-percent limitation by accepting one ineligible transfer student, "Vincent R.," and TEA also determined that Samnorwood had failed to enter three transfers into STS. TEA informed Samnorwood by letter on March 24, 2004, that $10,746 in funds would be withheld from its funding for the following year due to the three unreported students and Vincent R.'s transfer. In another letter dated March 24, 2004, TEA informed Harrold that it would have $100,069 withheld from its funding for the following year because it had failed to enter seventeen transfers into STS. The School Districts both requested an informal review of TEA's funding decision as provided by TEA policy. During that review, both School Districts admitted that they had not entered the transfers into STS, but they were able to show that some of the transfers were nevertheless eligible for funding because they were approved exemptions as defined by the Modified Order.[9] TEA waived the nonreporting fine for theses students. TEA also restored funding for Vincent R. because Samnorwood was able to prove that, on the day his transfer was entered, STS declared him an eligible transfer. TEA, however, left the fines intact for the three unreported transfers from

---

[9] The Modified Order provides exceptions to the transfer rules for students whose older siblings attend the school to which they wish to transfer and for students whose parents are teachers at the school to which they wish to transfer.

Samnorwood and the twelve unreported and nonexempt transfers from Harrold, so after the informal review, Samnorwood was penalized $6,111, and Harrold was penalized $68,525.[10]    In late 2004 the School Districts intervened into this case (United States v. Texas) in order to challenge the sanctions imposed by TEA and the validity of the Modified Order on its face and as applied to them.

In its order, the district court held that it did not exceed its remedial power by entering the Modified Order because it did not seek to reverse segregative effects on public schools based on private residential decisions, and that its mandate was not more broad than necessary to cure a constitutional injury.  It also noted that the Modified Order properly applied statewide because it was meant to eliminate the vestige of discrimination that remained from the fact that Texas operated a "state-wide dual school system prior to desegregation in the 1960s."  Mem. Op., July 24, 2006.

On the issue of the sanctions, the district court held that since Texas provides a "sparsity adjustment" to small schools that guarantees school districts with Samnorwood and Harrold's enrollment levels to be funded as if they had 130 student, the School Districts did not receive any additional funds due to these transfers.[11]  The district court then reasoned that sanctions by TEA were not mandated by the Modified Order for transfers that decreased diversity by more than three percent in schools that received the sparsity adjustment because section A(6) of the Modified Order only instructs TEA to refuse to transfer funds associated with the ineligible transfer student, and since the School Districts were already being funded at a level of 130 students because of the sparsity adjustment, they did not actually receive any extra funds due to the

---

[10] TEA maintained that these financial sanctions were appropriate because the failure to enter transfers into STS effectively prevents TEA from determining which transfers comply with the Modified Order.

[11] The "sparsity adjustment" states that any school operating with less than 130 but more than ninety students will be funded as if it had 130 students. Tex. Educ. Code § 42.105.

transfer of a new student. The district court also admonished TEA for sanctioning school districts for failing to report transfers when STS did not maintain a record of whether transfers were approved or not, thereby impermissibly placing the burden on schools to keep a record of their STS transactions themselves.

The district court ultimately held that the School Districts were not to be sanctioned, even for the students that they failed to enter into STS. However, it made it clear that TEA was free to sanction school districts who failed to enter student transfers into STS in the future. Order Den. Mot. to Am. J., Aug. 10, 2006, at 1-2 ("TEA's policy of sanctioning districts for their failure to enter students into the STS system is reasonable, and nothing in the Court's Memorandum Opinion casts doubt on TEA's continuing ability to impose such sanctions . . . .").

## DISCUSSION

### I.    Justicibility

TEA, the League of United Latin American Citizens ("LULAC"), and G.I. Forum[12] argue that this court lacks jurisdiction under Article III to hear this appeal. Therefore, we will first consider whether or not the appellant has "made out a 'case or controversy' between himself and the [appellees] within the meaning of Art. III." Warth v. Seldin, 95 S.Ct. 2197, 2205 (1975); see U.S. Const. art. III, § 2. In order for there to be a justiciable case or controversy under

---

[12] LULAC and G.I. Forum had previously intervened in this civil action. United States v. Texas (LULAC), 680 F.2d 356, 372-73 (5th Cir. 1982). Because of this prior intervention they were still parties to the proceeding when the School Districts petitioned to intervene. They did not participate in the bench trial, but they did participate pretrial (e.g. they filed a motion challenging the intervention of parties other than the School Districts and a response supporting TEA's motion to dismiss). They also filed a joint brief in this court challenging the School Districts' standing on appeal. Since the parties jointly filed their brief, for simplicity we will refer to arguments in the brief as being from LULAC only.

Article III, a litigant must show that he has standing. See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 102 S.Ct. 752, 758 (1982). Such a case or controversy must exist throughout the litigation; in other words, the case cannot be moot. Honig v. Doe, 108 S.Ct. 592, 601 (1988). This court is "obligated to address issues of jurisdiction, including mootness, prior to addressing the merits of an appeal." Goldin v. Bartholow, 166 F.3d 710, 714 (5th Cir. 1999).

LULAC argues this case is moot because the School Districts received the relief they requested in the district court, namely, the sanctions were vacated.[13] LULAC's contention is incorrect, however, because in their complaint the School Districts sought, in addition to having the fines vacated, a declaratory judgment holding that the student transfer provisions of the Modified Order exceeded the district court's desegregation jurisdiction on its face and as applied by TEA, a decree vacating the student transfer provisions of the Modified Order, and a permanent injunction restraining TEA from regulating student transfers under the Modified Order. The district court did not grant the School Districts any of these forms of relief, so the School Districts' claims for equitable relief are not moot. However, we must still decide whether the School Districts have standing to seek these alternative forms of relief.

In order for a plaintiff to have sufficient standing under Article III, that plaintiff must show that: he has suffered or will suffer an injury, his injury is

---

[13] LULAC also argues that if we were to decide this case it would be an advisory opinion because there are not sufficiently adverse parties. We do not agree with this contention. TEA has a sufficiently adverse interest to the School Districts in this case because it continues to maintain that the School Districts are not entitled to be exempted from the Modified Order, the very thing the School District seeks. LULAC itself also had the opportunity to challenge the School Districts' request for relief in its brief and at oral argument. Finally, the United States participated in all aspects of this case up until the appellate phase and it too was challenging the School Districts' claims that they should no longer have to abide by the Modified Order. We therefore believe that there were parties with sufficiently adverse interests involved in this case to ensure a proper case and controversy. See Goldin v. Bartholow, 166 F.3d 710, 717-20 (5th Cir. 1999).

traceable to the defendant's conduct, and a favorable federal court decision will likely redress the injury.[14] Bennett v. Spear, 117 S.Ct. 1154, 1163 (1997). Here the School Districts' injury is being subjected to an injunctive remedy, the Modified Order, which potentially imposes monetary fines, places them at risk of losing their accreditation, and limits their ability to accept student transfers that they would otherwise be permitted to accept under Texas law.[15] What makes this case unique is that the School Districts were not a party to the original suit. If the School Districts had been a party directly bound by the Modified Order there would be no question that they had standing to challenge the Modified Order. Here the School Districts were not a party to the Modified Order, but their actions are collaterally constrained by the Modified Order because it prohibits TEA from funding student transfers to their school that exceed the one- or three-percent threshold, and without funding they cannot afford to accept such transfers.

While we have found no cases directly on point, this situation is analogous to cases where this circuit has held that a third party had standing to appeal an injunction which adversely affects its interest, even when it was not a party to

---

[14] Neither TEA nor LULAC argue that the School Districts' alleged injury is not redressable or traceable. TEA has admitted that its only authority to impose sanctions on school districts because of student transfers flows from its obligation to implement the Modified Order, so the potential sanctions are traceable to the Modified Order. Additionally, if this court were to provide the School Districts with their requested relief, a declaration that the Modified Order should not be applied to them, their alleged injury would be redressed. Therefore, the School Districts satisfy these two prongs of Article III standing.

[15] While the district court's order held that TEA can no longer deny the School Districts funding for unapproved transfers as long they continue to fall within the sparsity adjustment (applicable to districts with 90 to less than 130 students, see note 11 supra), there is no guarantee that their enrollment will not exceed the sparsity adjustment in the future. In fact, Harrold enrolled 129 students for the 2003-2004 school year and Samnorwood enrolled 134 students during the 2004-2005 school year. Additionally, the Modified Order instructs TEA to revoke the accreditation of school districts that continue to enroll a transfer student that exceeds the three-percent rule after ten days of being informed that the transfer student is ineligible. This mandate of the Modified Order would apply whether or not the school falls within the sparsity adjustment.

the litigation. See United States v. Holy Land Found. for Relief & Dev., 445 F.3d 771, 780-81 (5th Cir. 2006) (judgment creditors had standing to challenge a restraining order that affected their ability to execute on assets, even though they were not a party to the case where the restraining order was entered), approved in this respect en banc, 493 F.3d 469, 472 (5th Cir. 2007) (en banc); Castillo v. Cameron County, Tex., 238 F.3d 339, 349 n.16 (5th Cir. 2001) (holding that the state of Texas had Article III standing to appeal an injunction even though it was a nonparty because the injunction adversely affected its interests); Charga v. San Antonio Light Div. of Hearst Corp., 701 F.2d 354, 358-60 (5th Cir. 1983) (holding that newspapers and reporters had standing to appeal a court order closing a pretrial bail reduction hearing at the request of a criminal defendant).[16]

In each of these cases, this court held that the challenging party had standing because the equitable relief granted by the district courts placed a burden on the challenging party which gave them a personal stake in the litigation. The case before us is no different.[17] The Modified Order, and TEA's

---

[16] Other circuits have held that there was standing in similar circumstances. See United States v. Kirschenbaum, 156 F.3d 784, 794 (7th Cir. 1998) ("[N]on-parties who are bound by a court's equitable decrees have a right to move to have the order dissolved, . . . and other circuits have held that where a non-party is purportedly bound by an injunction, the non-party may bring an appeal rather than face the possibility of a contempt proceeding."); In re Estate of Ferdinand Marcos Human Rights Litig., 94 F.3d 539, 544 (9th Cir. 1996) (finding standing for nonparty where injunction confronted nonparty "with the choice of either conforming its conduct to the dictates of the injunction or ignoring the injunction and risking contempt proceedings"); In re Piper Funds, Inc., Institutional Gov't Income Portfolio Litig., 71 F.3d 298, 301 (8th Cir. 1995) ("A nonparty normally has standing to appeal when it is adversely affected by an injunction.").

[17] That the School Districts intervened in this longstanding case to challenge the Modified Order and its application rather than attempting to enter litigation at the appellate phase, as in the cited cases, is of no significance to the question of standing. A party must have standing at all points of the litigation. Honig v. Doe, 108 S.Ct. 592, 601 (1988). So if the adverse affects of the equitable relief were sufficient to provide standing to the parties to appeal in the cited cases, similar adverse affects from the Modified Order are sufficient to give the School Districts standing when they intervened in the district court and now to appeal the decision of that court.

regulations to enforce it, impose severe penalties if the School Districts fail to adhere to TEA's reporting requirement or accept a transfer that trips the one- or three-percent rule.[18] The School Districts also expend time and resources complying with the Modified Order every time they seek to accept a transfer student. Finally, the Modified Order effectively prohibits the School Districts from doing something that they contend they are permitted to do under Texas law and the United States Constitution: accept as many transfer students, of any race or ethnicity, as they wish if they do so in a nondiscriminatory manner. In two school districts that rely on transfer students for their financial viability, this is not a consequence to be ignored. For these reasons, the Modified Order presents a real adverse impact on theses schools, and therefore, they have standing to challenge its application to them.[19]

At its core standing is about ensuring that a party with a sufficiently strong interest is the one who brings a cause of action. See Baker v. Carr, 82 S.Ct. 691, 703 (1962) (The question of standing is whether the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions?"); see also Flast v. Cohen, 88 S.Ct. 1942, 1952 (1968) ("[W]hen standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a

---

[18] Although the monetary fines have been lifted in this case, TEA is free to impose the fines for not reporting in the future and if either school falls outside the sparsity adjustment they are again subject to fines for violating the three-percent rule.

[19] If we were to hold that the School Districts did not have standing in this case, their only available recourse would be to violate the Modified Order and wait to be sanctioned. We have not required this of parties under a district court's equitable power in the past. See Castillo v. Cameron County, Tex., 238 F.3d 339, 350 (5th Cir. 2001) (holding that the fact that a party could be found in contempt for violating the court order in the future was a sufficient injury to provide standing for a pre-enforcement challenge to the decree).

particular issue and not whether the issue itself is justiciable.") Here the school districts are challenging whether the Modified Order can properly be applied to them. We can think of no better party to raise such a claim than the School Districts themselves.

II.    Merits

The School Districts argue that the Modified Order's student transfer provisions are unlawful because they exceed the equitable power of the district court to fashion a desegregation remedy. Their argument flows from the principle that in "any equity case, the nature of the violation determines the scope of the remedy." Swann v. Charlotte-Mecklenburg Bd. of Educ., 91 S.Ct. 1267, 1276 (1971). The import of this principle is that in school desegregation cases, "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation . . . ." Milliken v. Bradley (Milliken II), 97 S.Ct. 2749, 2758 (1977). In applying this standard, the factual findings of the district court are reviewed under the clearly erroneous standard. United States v. Texas (Goodrich), 158 F.3d 299, 306 n.8 (5th Cir. 1998). Whether a constitutional right has been violated is a question of law that this court reviews de novo. Gates v. Cook, 376 F.3d 323, 333 (5th Cir. 2004). If a constitutional violation is found, we employ an abuse of discretion standard in reviewing the equitable remedy itself. Swann, 91 S.Ct. at 1280.

Here the School Districts contend that the Modified Order exceeds the district court's equitable power because it applies to them even though they have never been under a desegregation order (and were never a party to this case until their 2004 intervention) and it was not shown that any of the transfers involved in this case were the approved due to an intent to discriminate. In support of their position, the School Districts cite a trio of cases involving the Modified Order. In the first, this court held that a remedial order mandating

that school districts provide bilingual language education to Mexican-American students could not be imposed on school districts without first determining whether they actually participated in segregation. United States v. Texas (LULAC), 680 F.2d 356, 372 (5th Cir. 1982) ("If remedial orders are to be imposed in Texas school districts on grounds of past segregation of students within the given district, that district must first be heard.") In the second, the district court's use of the Modified Order to invalidate a detachment and annexation of territory was reversed because there was no "showing that the school authorities '[had] in some manner caused unconstitutional segregation . . . .'" Goodrich, 158 F.3d at 309 (citing Pasadena City Bd. of Educ. v. Spangler, 96 S.Ct. 2697, 2704 (1976)). In the third, this court overturned an injunction entered pursuant to the Modified Order, which barred TEA from disbursing state funding for any white transfer students at Mumford ISD and Mumford ISD from receiving any more white transfer students. United States v. Texas (Hearne), 457 F.3d 472, 484 (5th Cir. 2006) ("[T]he question is not whether Mumford complied with TEA directives; Mumford must have acted with discriminatory intent in accepting the transfers.").

Each of those opinions begin with the Supreme Court's instruction in Swann: "the nature of the violation determines the scope of the remedy." 91 S.Ct. at 1276. In each of the above cited decisions of this court, we struck down the remedy because there had been no showing of a constitutional violation. We are presented with a similar situation. In this case, these two School Districts were denied funding because they failed to enter students in the STS system that TEA uses to monitor compliance with the order. TEA acknowledges (and neither LULAC nor the district court here ever disputed) that there is no basis under Texas state law for it to impose such sanctions on the school districts.[20]

---

[20] This opinion does not affect Texas's ability to regulate or collect information regarding student transfers, if it should so choose. The issue presented in this case is whether the

14

The sole basis of TEA's power to impose these sanctions stems from its duty to comply with the Modified Order. Thus the modified order and TEA's actions pursuant to it constitute a remedy that must flow from a constitutional violation. Milliken II, 97 S.Ct. 2758. However, as in Goodrich and Hearne, neither Harrold nor Samnorwood have ever been found to have discriminated against students of the basis of their race or ethnicity. In fact, TEA does not (and did not) investigate or conduct a hearing to determine whether a particular transfer was accepted or denied due to a segregative intent on the part of a sending or receiving school district before imposing sanctions on a school district. The failure to report or the triggering of the one- or three-percent threshold is all that is required. This use of an arbitrary percentage as a proxy for intentional discrimination has been criticized previously by this court,[21] and such a quantitative review cannot substitute for actual evidence of intentional discrimination on the part of these two School Districts. There has been no such evidence presented in this case. Therefore, allowing these two School Districts to remain under the Modified Order would improperly impose a desegregation remedy where there has been no showing or finding of a constitutional violation.

In the district court's memorandum opinion, it held that it was proper for TEA to enforce the student transfer provisions of the Modified Order against the School Districts because they were part of a state-wide dual school system. This inference, however, has been specifically rejected by this circuit. See Hearne, 457 F.3d at 483 ("Because Mumford was not a party defendant to the original litigation that resulted in Order 5281, it cannot be condemned for violating the

---

Modified Order can obligate TEA to enforce its student transfer provisions against these two School Districts.

[21] The prophylactic percentage rule of the Modified Order is potentially an "unenforceable vestige of conditions long since substantially remedied . . . [that] lives on, however, as a cause of voluminous continuous recordkeeping and monitoring by TEA and all Texas school districts." Hearne, 457 F.3d at 478 n.8.

Order without a finding that it intentionally engaged in segregative conduct."). Moreover, the only evidence shows that neither of these two Districts has been any part of a dual or segregated school system ever since a time more than three years prior to the initial filing this suit in March 1970, and there has been no judicial determination to the contrary.

The district court also held that because TEA was a defendant in the initial suit and had been found to be promoting a dual-school systems in the state of Texas, the Modified Order can permissibly mandate TEA to enforce provisions of the Modified Order against any schools it funds. The district court believed that this was consistent with Swann's mandate that a remedy may only extend as far as the constitutional violation. We cannot agree.

While it is undisputed that TEA funded some segregated schools at the time the Modified Order was entered, that does not empower the district court to force TEA to impose a remedy on these two School Districts (neither of which had been segregated for years prior to filing of the suit in which that order was entered). See Lee v. Lee County Bd. of Educ., 639 F.2d 1243, 1256 (5th Cir. 1981) ("a federal court cannot impose liability on individual defendant school districts on the basis of a general inverse respondeat superior theory holding them presumptively responsible for actions of the state or another governmental entity" and "one cannot presume that racial imbalances between separate school districts result from unconstitutional discriminatory acts on the part of those school districts") (citing and discussing Milliken v. Bradley, 94 S.Ct. 3112 (1974)). Had the School Districts been a party to the original 1970 litigation, the district court would not have been able to impose a remedy policing their student transfers because they were not (and had not been for more than three years before the suit was filed) segregating students. Additionally, since the dates on which both of the School Districts desegregated, there has not been a determination, or indeed any evidence, that either has attempted to resegregate

16

or to accept student transfers with discriminatory intent. Absent such a showing, the district court cannot invoke TEA's long past wrongdoing as a justification to require TEA to monitor nondiscriminatory student transfers involving Samnorwood and Harrold ISDs.

Of course, our opinion today does not give the School Districts a license to discriminate. If evidence arises that either of these school districts is acting with discriminatory intent when accepting or rejecting transfer students, then they would be subject to suit and a remedy would then be in order to correct the constitutional violation. Our decision today only holds that the prophylactic provisions created by the Modified Order to remedy the segregative conduct on the part of TEA and all-black schools in East Texas should not be imposed on these two panhandle school districts that had long previously already desegregated and have never since been found to have acted with segregative intent.

## CONCLUSION

We render judgment that Samnorwood ISD and Harrold ISD shall no longer be subject to the Modified Order's student transfer provisions or TEA's regulations promulgated to enforce those provisions. To the extent that the district court declined to so rule its judgment is reversed.

REVERSEDand RENDERED.