REVISED April 12, 2010

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 22, 2010**

Charles R. Fulbruge III
Clerk

No. 08-40858

UNITED STATES OF AMERICA

Plaintiff-Appellee

and G.I. FORUM and LULAC

Plaintiff-Intervenors-Appellees

v.

STATE OF TEXAS, TEXAS EDUCATION AGENCY, and TEXAS
COMMISSIONER OF EDUCATION

Defendants-Appellants

---

Appeal from the United States District Court
for the Eastern District of Texas

---

Before KING, GARWOOD, and DAVIS, Circuit Judges.

GARWOOD, Circuit Judge.

Defendants-appellants, the State of Texas, the Texas Education Agency
(TEA), and the Texas Commissioner of Education (collectively, defendants),
appeal the district court's finding that defendants denied students with limited-
English proficiency (LEP students) equal educational opportunities in Texas
public schools, thereby violating the court's longstanding injunctive order (the

Modified Order) and Section 1703(f) of the Equal Educational Opportunities Act (EEOA), 20 U.S.C. § 1703(f). Defendants also appeal the district court's denial of their subsequent motion to modify the Modified Order. We REVERSE the district court's denial of defendants' motion to modify, and REVERSE and REMAND as to the district court's finding of a violation of the Modified Order and Section 1703(f).

## I. PROCEDURAL HISTORY

This appeal arises out of litigation with a long and complex procedural history. It is an offshoot of a suit originally filed in 1970 in the Eastern District of Texas by plaintiff-appellee, the United States, against defendants concerning nine all-black school districts located in northeastern Texas. The suit resulted in the district court's issuance of the July 1971 Modified Order, a permanent injunctive order that provided for the district court to supervise broad aspects of the State's educational system and policies.[1]

The Modified Order contains a number of provisions. Pertinent to the merits of this case is Section G, entitled "Curriculum and Compensatory Education." Section G is comprised of two subsections. The first, Section G(1), contains broad language, providing that: "Defendants shall insure that school districts are providing equal educational opportunities in all schools." Section G(2) is more specific and requires TEA to conduct a study of the educational needs of minority children throughout the entire state and report its findings to the district court.[2]

---

[1]The district court's original order was modified by this court on appeal, hence its title, "the Modified Order." See United States v. Texas, 321 F. Supp. 1043 (E.D. Tex. 1970), modified and supplemented, 330 F. Supp. 235 (E.D. Tex. 1971), aff'd in part, modified in part and remanded, 447 F.2d 441 (5th Cir. 1971).

[2]Specifically, Section G(2)(a) requires that TEA file a report containing "[r]ecommendations of specific curricular offerings and programs which will insure equal

2

Also pertinent is Section J of the Modified Order. Section J provides: "This Court retains jurisdiction of this matter for all purposes, and especially for the purpose of entering any and all further orders which may become necessary to enforce or modify this decree."

In 1972, plaintiffs-intervenors-appellees, LULAC and G.I. Forum (collectively, intervenors), were allowed to intervene as representatives of all Mexican-Americans in Texas. In 1975, intervenors filed a motion to enforce Section G of the Modified Order, alleging that defendants were denying equal educational opportunities to Mexican-American students in Texas public schools. United States v. Texas (LULAC I), 506 F. Supp. 405, 410 (E.D. Tex. 1981), rev'd, 680 F.2d 356 (5th Cir. 1982). Intervenors also alleged claims under the Equal Protection Clause of the Fourteenth Amendment and Section 1703(f).

In its January 1981 opinion, the trial court rejected intervenors' Section G claim, holding that "[s]ection G of the [Modified Order] required only the filing of a report to propose remedial programs," and TEA had already fulfilled this requirement. Id. at 410. Still, the trial court held that defendants had subjected Mexican-Americans to past de jure discrimination, and the state's failure to take appropriate action to meet language difficulties encountered by Mexican-American LEP students constituted a violation of Section 1703(f). Id. at 411, 433–34. On those grounds, the court ordered defendants to offer bilingual instruction to all Mexican-American LEP students in Texas public schools.[3] Id.

_____

educational opportunities for all students . . . [including] programs and curriculum designed to meet the special educational needs of students whose primary language is other than English." TEA complied with this subsection and has no residual obligations under it. United States v. Texas (LULAC I), 506 F. Supp. 405, 410 (E.D. Tex. 1981), rev'd, 680 F.2d 356 (5th Cir. 1982).

[3]On June 12, 1981, the Texas legislature enacted the 1981 Bilingual and Special Language Programs Act, which compelled bilingual education in kindergarten through sixth grade, thereby placing the state in substantial compliance with the trial court's order.

at 439–41.

Defendants appealed, and this court reversed and remanded. United States v. Texas (LULAC II), 680 F.2d 356, 372 n. 25 (5th Cir. 1982). This court held that the evidence did not support the trial court's finding of past statewide de jure segregation of Mexican-Americans in Texas public schools. Id. at 362, 369–71. We further held that the trial court should have granted defendants' post-trial motion to vacate due to the state's enactment of new legislation. Id. at 372. Finally, this court expressed grave concern that no local school districts were party to the case,[4] and instructed the district court, before proceeding on remand, to determine "what questions—if any—presented by the case are subject to resolution on a statewide basis." Id. at 374. On remand, intervenors did not seek, and the trial court did not make, any such determination, and

---

United States v. Texas (LULAC II), 680 F.2d 356, 372 n. 25 (5th Cir. 1982). It also required TEA to conduct on-site monitoring to insure local districts were complying with the Act. Id. In light of this legislative action, the state filed a post-trial motion to vacate the injunctive remedy as moot. Id. The district court denied the motion. Id.

[4]Specifically, this court's opinion stated:

". . . [T]he geographical distribution of Mexican-American students in Texas . . . is anything but homogeneous across the state; hence conditions vary substantially from school district to school district, some districts comprising heavy majorities of Mexican-American students, some having virtually none . . . [T]here exists little if any practical or logical justification for attempting to deal on a statewide basis with the problems presented by this case. . . The State of Texas, qua state, directly educates no one; this is the work of the school districts . . . [T]he language problems to be met will necessarily vary by district . . . . [W]hether the effect of a local language program, state-mandated or not, constitutes appropriate action to deal with language barriers faced by the students of a given school district will of necessity be an essentially local question. . . . We fail to see how [this case] can be properly resolved in the absence of the school district concerned or how [it] can effectively be dealt with on a statewide basis."

Id. at 373–74 (emphasis added).

4

nothing became of the case for some twenty-four years.

On February 9, 2006, however, intervenors filed a motion for further relief under the Modified Order, again alleging violations of Section G and Section 1703(f). On February 28, 2006, the United States intervened in a limited capacity.

On July 27, 2007, after a five-day bench trial, the district court denied intervenors' motion. United States v. Texas (LULAC III), No. 6:71-CV-5281, 2007 WL 2177369, at *18 (E.D. Tex. July 27, 2007).[5] The district court held that intervenors failed to establish a Section G violation because no evidence of past statewide de jure segregation of Mexican-Americans was presented. Id. at *9. Further, the trial court held that intervenors failed to prove a Section 1703(f) violation because, viewing the panoptic results, the evidence showed that "language barriers are actually being overcome as to [primary LEP students]," and intervenors "failed to link [data indicating under-performance by secondary LEP students] with any flaw in Texas's bilingual/ESL program." Id. at *18.

On August 13, 2007, intervenors filed a motion to amend the judgment, arguing that the district court committed a manifest error of law and fact by ignoring the failure of the secondary LEP language program. Nearly a year

---

[5]Prior to the bench trial, defendants filed multiple motions to dismiss on jurisdictional and standing grounds. The trial court dismissed all of defendants' jurisdictional claims, holding that it retained jurisdiction over intervenors' Modified Order claims under Section J, and it could exercise jurisdiction over intervenors' supplemental EEOA claim as a "successive motion" that "lineally descended" from intervenors' 1981 action. United States v. Texas (LULAC IV), 572 F. Supp. 2d 726, 732–33 (E.D. Tex. 2008). The district court also held that intervenors had associational standing because LULAC identified 14 members who were parents of one or more LEP students. In total, these 14 members represented 20 children, 7 of whom attended schools in Dallas Independent School District, 12 in Del Valle Independent School District, and one in Manor Independent School District (the latter two school districts are located in Travis County, in the Western District of Texas, the first district is located in Dallas County, in the Northern District of Texas).

5

later, on July 24, 2008, the trial court granted the intervenors' motion to reconsider the prior judgment, "in order to correct clear and manifest errors of law and fact upon which the judgment is based." United States v. Texas (LULAC IV), 572 F. Supp. 2d 726, 730 (E.D. Tex. 2008). The trial court then vacated its July 27, 2007 order in full, and entered a new judgment, holding that defendants had violated both the Modified Order and Section 1703(f). Id. at 755, 762. In taking these actions the trial court relied primarily on new "persuasive" authority, namely Flores v. Arizona, 516 F.3d 1140 (9th Cir. 2008).[6] It then granted a remedial decree pursuant to the EEOA violation, ordering defendants to "establish a new monitoring system and establish a language program that fulfill the requirements of the [EEOA]," "to submit a monitoring plan addressing [failures of the monitoring program,] and to submit a proposed new language program for secondary LEP students by January 31, 2009." From that decision, the defendants timely appealed.

---

[6]Thus, the trial court's July 24, 2008 opinion states, for example:

"A persuasive February 22, 2008 decision by the Ninth Circuit Court of Appeals, Flores v. Arizona, 516 F.3d 1140 (9th Cir. 2008), allowed the Court to perceive its previous clear and manifest errors of fact and law, regarding the application of NCLB requirements to EEOA implementation and the court's analysis of the distinct bilingual and ESL programs. Persuaded by the circuit court, this Court adopts conclusions of law from the holdings in Flores."

Id., 572 F. Supp. 2d at 759-60, and,

"As discussed infra, the holdings in Flores persuaded the Court that it committed clear and manifest error in its factual finding that it was compelled to consider the 'panoptic results' of LEP students in all grades rather than considering the achievement of primary and secondary students separately."

Id., 572 F. Supp. 2d at 762. However, after this appeal was taken, the Supreme Court reversed the Ninth Circuit's Flores decision. Horne v. Flores, 129 S.Ct. 2579 (2009).

6

On August 18, 2008, defendants filed a motion to further modify the Modified Order, arguing that this court's recent decision in Samnorwood Independent School District v. Texas Education Agency, 533 F.3d 258 (5th Cir. 2008), constituted a change in law and required that the Modified Order's application be limited to the original school districts in the 1970 action. The trial court granted in part, and denied in part, defendants' motion, and amended the Modified Order to exempt the two Samnorwood school districts and all "school districts that: (1) were not parties to the original 1970 litigation; (2) were unitary prior to the commencement of the 1970 litigation; and (3) have never since been shown to have attempted to resegregate or act with segregative intent." United States v. Texas (LULAC V), No. 6:71-CV-5281, 2008 WL 5334404, at *7 (E.D. Tex. Dec. 17, 2008). Defendants also appeal from that order.

## II. TRIAL COURT'S FINDINGS AND CONCLUSIONS

Background

Chapter 29 of the Texas Education Code mandates bilingual education and English as a second language ("ESL") programs in all Texas schools. TEX. EDUC. CODE § 29.051. Bilingual programs are offered in kindergarten through sixth grade (primary education), while ESL programs are offered in seventh through twelfth grade (secondary education). LULAC IV, 572 F. Supp. 2d at 736. However, local school districts may elect either bilingual or ESL programs "or other transitional language instruction" for the seventh and eighth grade LEP students. TEX. EDUC. CODE § 29.053(d)(2).[7] These programs are significantly different; bilingual instruction teaches course materials in both English and the student's native language, while ESL instruction teaches materials in modified English for easier comprehension by LEP students. LULAC IV, 572 F.2d at 735.

---

[7]In the years in evidence, apparently all used ESL.

Students' participation in bilingual and ESL programs is subject to parental permission, which may be, and sometimes is, withheld.

Under the Texas Education Code, "[t]he school districts and charter schools created in accordance with the laws of this state have the primary responsibility for implementing the state's system of public education and ensuring student performance in accordance with this code." TEX. EDUC. CODE § 11.002. And, "[a]n educational function not specifically delegated to [TEA] is reserved to and shall be performed by school districts or open-enrollment charter schools." Id. § 7.003. Under Section 7.021(b), TEA is given diverse powers to "administer and monitor compliance." TEA is given certain authority respecting monitoring compliance with various programs, including the state bilingual education and ESL programs. Id. §§ 29.051-29.064. Under Section 7.028(a), such compliance monitoring function extends "only as necessary to ensure . . . compliance with federal law and regulations" (and financial integrity and certain "data integrity"); and under section 7.028(b), "[t]he board of trustees of a school district or the governing body of an open-enrollment charter school has primary responsibility for ensuring that the district or school complies with all applicable requirements of state educational programs." TEA is required to "evaluate the effectiveness of [bilingual and ESL] programs" as "compared to state established standards." Id. §§ 29.062(a), 39.053(c). Factors to be considered include, among other things, drop-out rates, graduation rates, and standardized test passing rates. Id. § 39.053(c).

In 2003, the TEA's previous monitoring program to evaluate program compliance was replaced with the Performance Based Monitoring Analysis System (PBMAS). PBMAS was first implemented in the 2004–2005 school year. Annually, the PBMAS generates a set of performance indicators on the district-level, based mostly on student passage rates on the Texas Assessment of

8

Knowledge and Skills (TAKS), a statewide achievement test. Each year the state sets standards for student passage rates in five subject areas and compares districts' performance to these standards. TEA assigns each district a performance level based upon the deviation of the district's passage rates from the state established standards. And a district's performance level determines whether the district will be subject to intervention and to what degree. In terms of LEP students, PBMAS evaluates the bilingual and ESL program using TAKS scores of LEP students, as well as other indicators, including the LEP annual drop-out rate, the LEP graduation rate, and LEP reading proficiency. At the time of the trial court's evidentiary hearing, only two years' worth of PBMAS data was available—the 2004–2005 school year and the 2005–2006 school year.

Problems With PBMAS

The district court identified two overall problems with TEA's monitoring procedures: (1) the kind of data collected by PBMAS inaccurately reflects how well a district is performing and cannot adequately detect deficiencies at the campus level; and (2) TEA's inadequate response to problems flagged by PBMAS contributes to the denial of educational opportunity.

In particular, the court determined that data collected by PBMAS show that some school districts are likely under-reporting the number of LEP students, and TEA has done nothing to verify these numbers. The court also found that although TEA compared the bilingual-ESL indicators to state standards for all students, TEA has no procedure for comparing the performance of LEP students to non-LEP students directly. The court further found that PBMAS's aggregation of scores for multiple grade levels as well as for entire school districts distorted the performance indicators and masked problems at specific schools.

With respect to on-site visits, the court determined that TEA had not

9

conducted any on-site monitoring for some years and had no bilingual-ESL certified monitors at the time of the trial. The court also considered other ways TEA monitors LEP students, such as monitoring that it performs under the No Child Left Behind (NCLB) program and the Texas accountability rating system. The court found that, although some of these monitoring programs disaggregate student performance data, they do not overcome the deficiencies in PBMAS because they do not target all relevant criteria for evaluating LEP students.

Achievement Of LEP Students

The district court also found that too high a proportion of the statewide secondary LEP student population were failing. At all grade levels and in all subject areas, secondary LEP students are performing poorly on TAKS. In fact, secondary LEP students have much lower passage rates on standardized tests than the general student body—creating a significant gap in achievement that ranges (roughly) between thirty-five and forty-five percentage points. Also, secondary LEP students have higher retention and drop-out rates when compared to the general student population. "LEP students fail to progress through or exit LEP programs in a reasonable time." LULAC IV, 572 F. Supp. 2d at 751. And LEP students participate in advanced courses at a "far lower rate than all students."[8] Id. at 752.

The trial court made no finding or determination that with respect to primary grades (kindergarten through sixth grade) the defendants had violated Section 1703(f).

### III. DISCUSSION

A. Appellate Jurisdiction

---

[8]The trial court's findings in this respect are extremely lengthy and detailed; for a more complete recital of these, see the trial court's opinion. 572 F. Supp. 2d at 738–42, 747–53.

The United States and intervenors first argue that this court lacks jurisdiction to review the interlocutory LEP Order. We disagree.

28 U.S.C. § 1292(a)(1) provides this court with jurisdiction over "[i]nterlocutory orders of the district courts of the United States . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." The trial court ordered that defendants "establish a monitoring system and establish a language program that fulfill the requirements of the Equal Education Opportunity Act, 20 U.S.C. § 1703(f)" for the 2009–2010 academic year and thereafter. The LEP order also requires defendants to "submit a monitoring plan addressing the failures of PBMAS and to submit a proposed new language program for secondary LEP students by January 31, 2009, or earlier." Id. We find these instructions to be sufficiently coercive to constitute a mandatory injunction appealable under Section 1292(a)(1). See Morales v. Turman, 535 F.2d 864, 867 n.6 (5th Cir. 1976), rev'd on other grounds, 97 S.Ct. 1189 (1977); see also Morales, 97 S.Ct. at 1190 (the district court's "judgment is reviewable on the merits in the Court of Appeals").

Though the above instructions do not specify the plan's exact content, defendants were ordered to affirmatively (and promptly) act to establish a monitoring system and to devise and implement a new secondary LEP program. There are over 1,200 school districts in the State of Texas. Devising a new monitoring system and secondary LEP language program for all of these districts would require extraordinary effort. Defendants would not only be forced to address a wide variety of concerns, e.g., funding, staffing, and even their own legislative authority to create and carry out such a plan, they would also need to implement substantial changes systemwide in a very short period of time.

Because the district court's order compels defendants to promptly and

11

affirmatively act in a specific and extremely extensive manner, the order constitutes a mandatory injunction over which this court may assert its appellate jurisdiction.

B.  Standard of Review

The district court's order granting intervenors' motion to alter the judgment, pursuant to Federal Rules of Civil Procedure 52(b) and 59(e), is reviewed for abuse of discretion.  See Ross v. Marshall, 426 F.3d 745, 763 (5th Cir. 2005), cert. denied, 549 U.S. 1166 (2007). "A district court abuses its discretion if it 'bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'"  Id. (quoting Hesling v. CSX Transp., Inc., 396 F.3d 632, 638 (5th Cir. 2005)).  In granting intervenors' motion to alter the judgment, the district court held that defendants violated both the Modified Order and the EEOA.  Thus, this court must independently review both holdings for abuse of discretion.

C.  Section G of the Modified Order

The district court retained remedial jurisdiction over all actions brought to enforce or amend the Modified Order. Modified Order, Section J.  Intervenors seek to enforce the Modified Order by invoking the broad language of Section G(1), which requires defendants to "insure that school districts are providing equal educational opportunities in all schools."  Id. at Section G.  Thus, the district court appropriately asserted jurisdiction over intervenors' claim.  After reviewing the evidence, the district court held that defendants violated Section G because PBMAS's flaws were so significant that defendants could not effectively insure that LEP students received equal educational opportunities in Texas public schools.  We conclude that this holding was in error.

"The Modified Order directs Defendants to take affirmative steps to eliminate all remaining vestiges of the former de jure segregated school system

12

in Texas, to prevent the recurrence of a segregated system, and to achieve fully integrated schools." LULAC IV, 572 F. Supp. 2d at 753 (citing United States v. Texas, 793 F.2d 636, 642 (5th Cir. 1986)). Significantly, the district court retains broad remedial jurisdiction only "over those facets of school operations [that] represent or flow from an earlier de jure discriminatory system." United States v. Texas (Goodrich), 158 F.3d 299, 311 (5th Cir. 1998). Thus, to find a violation of the Modified Order, the trial court must determine that the contested action "represents or flows" from a de jure segregated or discriminatory system. As defendants are state actors and the trial court ordered a statewide remedy, the decision below cannot be upheld absent a showing of statewide de jure segregation of Mexican-Americans.

This court has repeatedly acknowledged the historical and statewide de jure segregation of black and white students in Texas, but has held that at no time "ha[s] Texas segregated Anglo students from Mexican-American ones by law." United States v. Gregory Portland Independent School District, 654 F.2d 989, 992 (5th Cir. 1981). Nor is the trial court entitled to presume such statewide de jure segregation absent an evidentiary hearing. See id. at 998. The trial court made no factual findings with regard to statewide de jure segregation of Mexican-Americans,[9] nor would the record here support such a finding.

---

[9]The trial court did state that: "this Court has already found [in the 1981 intervention], and the Fifth Circuit has upheld, that TEA and the State of Texas [were] involved in intentional discrimination against Spanish speaking Mexican-American students [in the past]." LULAC IV, 572 F. Supp. 2d at 756. The district court clearly misunderstood this court's 1982 decision, where we reversed the district court's findings and held that there was not adequate "factual support for the [district] court's finding of historical segregation of Mexican-Americans." LULAC II, 680 F.2d at 370. The district court also ignored this court's determination in Gregory-Portland that no such system existed. 654 F.2d at 992. Thus, the lower court erred in concluding that Mexican-Americans suffered statewide de jure discrimination in the past (although the court disclaimed basing its presently challenged orders on any such determination, 572 F. Supp.

13

Because there is no showing of statewide de jure segregation of Mexican-Americans, the trial court cannot enforce Section G under the facts and claims presented.

Further, the district court erred in relying on its broad remedial jurisdiction under the Modified Order to assert jurisdiction over intervenors' EEOA claim. In determining whether it had jurisdiction, the trial court reasoned that, because intervenors' claims were a continuation of the 1981 intervention under the Modified Order, the "instant action [was] a successive motion . . . lineally descending from the Fifth Circuit's remand in [1982]." LULAC IV, 572 F. Supp. 2d at 732. Yet, the trial court had previously held that intervenors' 1981 Section G claim was without merit. LULAC I, 506 F. Supp. at 410. There, the trial court held that Section G only required defendants to conduct a study and file a report proposing remedial programs for, among other things, curricular offerings for students who primarily spoke a language other than English. Id. at 411. And intervenors' Section G claim was denied because TEA timely satisfied this obligation.[10] Id. at 411.

It is unclear to this court how intervenors' claim could be a successive motion when the original claim was previously denied. And even if, as the trial court suggests, intervenors raised new facts suggesting a violation of Section G's broader principle of equal educational opportunities, there has been no finding of statewide de jure segregation of Mexican-Americans in Texas. Thus, the lower court erred in finding that intervenors could establish a Section G violation, and

2d at 758).

[10]The trial court addressed this apparent contradiction between the present order on appeal and the original 1981 order, reasoning that "it is abundantly clear that [it] was referring to Section G(2), and therefore did not hold that Section G(1) [sic], which has nothing to do with the reporting requirement, was complied with by virtue of filing the report."

14

the district court should not have exercised jurisdiction over intervenors' supplemental EEOA claim pursuant to its remedial jurisdiction over the Modified Order.

Because intervenors' Section G claim was invalid pursuant to the district court's own order in 1981 and Fifth Circuit precedent, we hold that intervenors' Section G and EEOA claims should have been severed into entirely separate lawsuits.

## D. Equal Educational Opportunities Act

### 1. Absence of Local Districts

The district court's finding of an EEOA violation is unreliable because the district court failed to adequately address this circuit's 1982 remand instructions. In 1982, this court questioned whether intervenors' EEOA claim could be appropriately addressed absent local school districts as parties. Specifically, we concluded that "there exists little if any practical or logical justification for attempting to deal on a statewide basis with the problems presented by this case." LULAC II, 680 F.2d at 373–74. See also note 4, supra. And we remanded the action to the district court with the following instructions:

> "[T]he language problems to be met will necessarily vary by district . . . . [W]hether the effect of a local language program, state-mandated or not, constitutes appropriate action to deal with language barriers faced by the students of a given school district will of necessity be an essentially local question. . . . We fail to see how [a question of Section 1703(f) compliance] can be properly resolved in the absence of the school district concerned or how [it] can effectively be dealt with on a statewide basis. . . . [W]e therefore direct the district court to determine . . . what questions—if any—presented by the case are subject to resolution on a statewide basis before proceeding further on the remand that we mandate."

Id. at 374.

In light of this court's analysis of the evidence below, we conclude that the

issues raised by intervenors' EEOA claim have not been properly addressed in the absence of individual school districts as parties.

This court notes that intervenors identified fourteen LULAC members who were parents of one or more LEP students. Those parents represent, in total, twenty LEP students attending schools within three individual school districts. See also note 5, supra. Not one of these school districts is named as a party to this action or located within the Eastern District of Texas.

Further, because no school district is a party to the present litigation, the issue remains as to whether the district court constitutes an "appropriate district court" capable of asserting jurisdiction over intervenors' claim. See 20 U.S.C. § 1708 ("The appropriate district court of the United States shall have and exercise jurisdiction of proceedings instituted under [this statute]." (emphasis added)). The district court improperly relied on its remedial jurisdiction under the Modified Order to assert jurisdiction over intervenors' supplemental EEOA claim; thus, it failed to adequately address whether it constituted an "appropriate district court" pursuant to Section 1708. Congress did not define "appropriate district court" in the statute, and there is little legislative history or judicial precedent on the issue.

We conclude that "an appropriate district court" is normally the district court in which a local school district, as a party to the action, is located. And once one or more local districts are added as parties in this litigation, the district court should reconsider whether it constitutes an "appropriate district court" for jurisdictional purposes or if the case should, instead, be handled in a forum that constitutes a proper venue for such additional parties.

2. The Evidence Presented Below

This court's decision regarding the necessity of a local school district is further supported because the record below is insufficient to uphold the trial

16

court's finding of an EEOA violation. To find a violation of, and order a remedy under, the EEOA, intervenors must establish (1) a violation of a student's rights under the EEOA, (2) that the violation "stem[med] from a failure to take 'appropriate action'" on the part of the defendants, Horne, 129 S.Ct. at 2605, and (3) that any remedial order is "essential to correct [the] particular denials" of EEOA rights found. 20 U.S.C. § 1712. We conclude that intervenors failed to make the requisite showing.

Under the EEOA, a state may not "deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by . . . the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." 20 U.S.C. § 1703(f) (emphasis added). Both state and local educational agencies are responsible for taking "appropriate action" under the statute,[11] but the EEOA "leave[s] state and local educational authorities a substantial amount of latitude in choosing the program and techniques they would use to meet their obligations under the EEOA." Castaneda v. Pickard, 648 F.2d 989, 1009–10 (5th Cir. 1981). See also Horne, 129 S.Ct. at 2589 (quoting Castaneda), id. at 2595 (". . . [T]he EEOA itself limits court-ordered remedies to those that 'are essential to correct particular denials of equal educational opportunity or equal protection of the laws,'" (quoting 20 U.S.C. §

---

[11]The EEOA defines "educational agency" as "a local educational agency or a 'State educational agency,'" and a state educational agency as "the agency primarily responsible for the State supervision of public elementary schools and secondary schools." 20 U.S.C.§§ 1720(a), 7801(41); see Gomez v. Ill. State Bd. of Educ., 811 F.2d 1030, 1042–43 (7th Cir. 1987) (holding that, where powers are retained by the state or its educational agency, the state is obligated to take appropriate action under § 1703(f)); Idaho Migrant Council v. Bd. of Educ., 647 F.2d 69, 71 (9th Cir. 1981) (holding that the EEOA "imposes requirements on the State Agency to ensure that . . . language deficiencies are addressed").

17

1712, emphasis by Supreme Court)).[12]

"[T]he State of Texas has chosen a system of shared responsibilities between state actors and local officials" in educational matters. LULAC IV, 572 F. Supp. 2d at 757. Under this system, local school districts are primarily responsible for the implementation of LEP programs, while TEA is responsible for ensuring compliance with federal and state law and evaluating and monitoring the effectiveness of LEP programs. TEX. EDUC. CODE §§ 7.003, 7.021(b)(1), 7.028, 11.002, 29.062. Thus, defendants' liability under the EEOA is dependent upon the extent to which they have failed to take "appropriate action" in fulfilling their legal responsibilities under state law – which in this case requires that they monitor and evaluate LEP programs via PBMAS – which failure has caused a deprivation of the rights of Mexican-American LEP students under Section 1703(f).

To determine the appropriateness of an educational agency's action, this court has instituted a three-prong test: (1) whether the program is based on sound educational theory, (2) whether reasonable efforts are being made to implement the theory (implementation prong), and (3) whether the program, over a legitimate period of time, has achieved some success in overcoming language barriers (results prong). Castaneda, 648 F.2d at 1009–10. After

---

[12]Moreover, while the No Child Left Behind Act of 2001 (NCLB) does not replace Section 1703(f) (and compliance with the former does not necessarily constitute compliance with the latter), nevertheless, as Horne states:

"NCLB marked a dramatic shift in federal education policy. It reflects Congress' judgment that the best way to raise the level of education nationwide is by granting state and local officials flexibility to develop and implement educational programs that address local needs, while holding them accountable for the results. . . . NCLB conditions the continued receipt of funds on demonstrations of 'adequate yearly progress.'" Id. at 2601.

Title III of NCLB specifically focuses on LEP students and their acquisition of English language proficiency. Id.

applying the above analysis, the district court concluded that defendants' use of PBMAS in its current form fails both the implementation prong and the results prong.[13]

The district court's ruling that a given defendant has or has not taken the "appropriate action" required of it under section 1703(f) presents "a mixed question of fact and law," review of which requires us to determine whether the trial court's "conclusion was adequately supported by subsidiary findings of fact which do not appear clearly erroneous." Castaneda, 648 F.2d at 1010. Whether such essentially historic facts adequately support the conclusion presents a question of law reviewable de novo. See St. Tammany Parish Sch. Bd. v. Louisiana, 142 F.3d 776, 782 (5th Cir. 1998).[14] To the extent that the subsidiary findings of fact are "premised upon an erroneous view of controlling legal principles" they "are entitled to no deference." Johnson v. Uncle Ben's, Inc., 628 F.2d 419, 422 (5th Cir. 1980).[15]

a. Implementation Prong

Under the implementation prong, a court must determine whether defendants' implementation of PBMAS "follow[s] through with practices, resources and personnel necessary to transform the [educational] theory into

---

[13]It is undisputed that defendants' primary and secondary LEP programs are based upon sound educational theory. See, e.g., 572 F. Supp. 2d at 763-64 ("There is no dispute that Defendants' bilingual and ESL programs are sound in theory.").

[14]". . . [O]ur court will 'review de novo, as a mixed question of law and fact, a district court's [merits-] decision that a local school district's IEP was or was not appropriate and that an alternative placement was or was not inappropriate under the IDEA.'" Id. (quoting Cypress Fairbanks ISD v. Michael F., 118 F.3d 245, 252 (5th Cir. 1997)).

[15]See also, e.g., Lake Charles Stevedores v. Professor Vladimer Popov MV, 199 F.3d 220, 223 (5th Cir. 1999); Johnson v. Hospital Corp. of America, 95 F.3d 383, 395 (5th Cir. 1996); Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc., 747 F.2d 995, 1000 (5th Cir. 1984) (". . . [W]hen essentially based on an incorrect legal principle, Rule 52(a) clearly erroneous does not apply and we disregard any such possible findings.").

reality." Castenada, 648 F.2d at 1010. Essentially, this Court must scrutinize whether defendants have made a "bona fide effort[] to make the program work." Id.

According to the district court, defendants failed the implementation prong because PBMAS, as implemented, cannot effectively monitor the progress of LEP programs and students. LULAC IV, 572 F. Supp. 2d at 765. The trial court identified a variety of "flaws" that rendered the system ineffective: (1) the absence of equality based comparisons, (2) under-identification of LEP students, and (3) the aggregation of data at the district level.

### 1. Equality Based Comparisons

First, the trial court determined that PBMAS was flawed because it did not make equality based comparisons between LEP and non-LEP students. Data collected under PBMAS compares LEP student achievement to state assigned target passage rates; a district's deviation from state targets determines its performance level, which in turn determines whether and to what degree TEA will intervene. Thus, PBMAS does not directly compare LEP student achievement with non-LEP student achievement, and absent such a direct comparison, the district court concluded that the program could not adequately monitor the effectiveness of LEP programs. The only basis the district court provided for this conclusion was that the EEOA is an equality based statute.

Federal law provides no instruction as to how states should analyze LEP student achievement. But the Supreme Court did recently hold that "the EEOA requires 'appropriate action' to remove language barriers, § 1703(f), not the equalization of results between native and nonnative speakers on tests administered in English." Horne, 129 S.Ct. at 2605. And by state law, defendants are only required to "evaluate the effectiveness of [bilingual and

ESL] programs" as "compared to state-established standards." TEX. EDUC. CODE §§ 29.062(a), 39.053(b). We do not believe that EEOA compliance requires the comparisons insisted on by the district court.

Further, reasonable minds could differ over what comparative method is most effective to determine whether language barriers are being overcome. The State of Texas and the TEA have determined that success is best measured by determining whether LEP students are achieving state-passage rate targets, and there is no evidence that the district court's preferred method of comparison is better than that of the State's.

In fact, the district court's method comes with significant faults. For example, standardized tests are administered to secondary LEP students in English, a language in which they, by definition, lack proficiency. Horne, 129 S.Ct. at 2603 n.16; Castaneda, 648 F.2d at 1014. English administration makes it difficult for test results to accurately capture an LEP student's knowledge of core curriculum, and it is inevitable that such students will not perform as well as non-LEP students. Also, once an LEP student has successfully completed a language remediation program, he or she is no longer identified as LEP, rendering it impossible for a direct comparison to adequately capture program successes. Thus, a direct comparison between LEP and non-LEP students may not adequately represent the actual achievement gap between the two groups. And, by making equality a priority, districts with a significant gap in passage rates will require intervention regardless of how high LEP student scores might be, whereas no intervention will occur in districts where LEP and non-LEP students have lower, but reasonably equivalent, scores.

The district court failed to adequately acknowledge any of the above criticisms and, instead, abused its discretion by supplanting defendants' educational policy decision with its own judgment. Moreover, there is no

21

evidence that any such method of comparison deficiency caused any deprivation of the Section 1703(f) rights of Mexican-American LEP students.

## 2. Under-identification of LEP Students

The district court also determined that school districts are "likely" under-identifying LEP students. LULAC IV, 572 F. Supp. 2d at 767–68. TEA is tasked with establishing criteria for identification, assessment, and classification of LEP students. TEX. EDUC. CODE § 29.056(a). Once a student is identified as LEP, the district must obtain parental consent for the child to take part in an LEP program. Id. However, parents may, and sometimes do, deny consent.

At trial, intervenors presented evidence that, while the state average of parental denials is 4.9%, some districts have reported a significantly higher percentage of denials.[16] Based on this evidence, the trial court determined that those districts must be under-identifying LEP students, and this under-identification decreases the perceived achievement gap between LEP and non-LEP students. LULAC IV, 572 F. Supp. 2d at 767–68.

We find that the district court reached this conclusion in error. The district court based its conclusion on the belief that a parental denial altered the identification of the student, so that the child is no longer characterized as LEP.

---

[16]Intervenors also presented evidence that some districts report a significantly lower percentage of LEP students than the county-wide percentage of households in which a language other than English is spoken. To the extent that the district court based its finding of under-identification on this evidence, we find that this conclusion was in error. The percentage of households in which a language other than English is spoken does not in any meaningful way evidence the number of LEP students residing within the county.

The district court also observed "it appears that in at least some of these schools [in districts with high rates of parental denials], parents may not be well informed of the advantages of bilingual-ESL programs or may be subject of coercion" (emphasis added). There is no substantial evidence of instances of any such "coercion" (or misinformation), and in any event the above quoted observations are entirely too vague and speculative to form any valid basis for relief against defendants. Finally, there is no substantial evidence of any default by defendants in performance of their duties in this respect causing Mexican-American LEP students' loss of their § 1703(f) rights.

22

Id. at 767–68. This conclusion is entirely incorrect—once students are identified as LEP, they remain identified as such until they obtain English proficiency, regardless of participation in the program. Thus, the district court abused its discretion in determining that the PBMAS data was unreliable due to the under-identification of LEP students.

### 3. Aggregation of Data

The district court also took issue with the PBMAS monitoring system's aggregation of data at the district level.[17] Id. at 768. The district court held that this comparative method prevents intervention on individual campuses that are not performing as well as the district overall. In reaching this conclusion, the court relied upon a study which showed that 277 schools, attended by a total of 54,963 LEP students, performed at a performance level lower than the stage of intervention required by the district's assigned performance level.[18] However, this study did not ascertain the total number of campuses in need of intervention or the total number of campuses subject to intervention based on the district-wide data. Thus, it did not provide what percentage of campuses in need of intervention or subject to intervention these 277 campuses actually represented.

Rather than questioning the significance of the report, the trial court perfunctorily concluded that aggregation of data at the district level rendered the PBMAS monitoring system ineffective. Further, the trial court determined

---

[17]The trial court also disapproved of TEA's aggregation of TAKS subject data across multiple grade levels. Defendants explained that TAKS subjects are not annually administered at each grade level; thus, to determine achievement in specific subjects, TAKS scores for each subject are combined across the grade levels in which the subject test was administered. The district court held that this allowed the scores of successful primary students to overinflate the success of the entire group, thus masking the underperformance of secondary LEP students.

[18]These numbers represent only 3.4% of campuses within the state and 7.7% of the LEP student population.

that it would be more reasonable for TEA to analyze data at the campus level to avoid this "masking effect."[19]  This conclusion ignores the allocation of shared responsibilities within the Texas education system.  Under Texas's system, local districts are primarily responsible for implementing LEP programs, and addressing and remedying under-performing campuses within their own district. On the other hand, TEA is responsible for intervening in failing districts to ensure overall compliance.[20]

There is no finding nor sufficient evidence that individual districts are ignoring LEP under-performance on individual campuses or sufficient evidence of resulting actual harm to such campuses and their students.  We accordingly find that the district court abused its discretion in supplanting defendants' policy choice with its own preferred method of comparison.[21]

On remand, the district court should reconsider the evidence,   in light of this court's opinion, to properly determine whether PBMAS, coupled with other sources of information (such as NCLB), is capable of effectively monitoring the success of LEP programs and whether any such monitoring deficiencies of defendants (together with any others so found) amount to a failure to take

[19]The district court felt a campus-level analysis was reasonable because TEA already collects both district-wide and campus data.

[20]In holding that the evidence adduced thus far fails to establish that the PBMAS monitoring system does not discharge the State's responsibilities under the EEOA, we do not necessarily foreclose a finding upon more factual development that district-wide monitoring may be inappropriate for larger school districts because of its potential for masking the deficiencies on individual campuses (nor do we now give either legal blessing or condemnation to any such finding on further factual development).

[21]The district court also explained that defendants should monitor at the campus level because the Modified Order was originally purposed to remedy segregation on the campus level and Section G requires that equal opportunities be provided in "all schools." To the extent the trial court relied in any way on the Modified Order to reach the above conclusions, we find it committed error because there has been no showing of statewide de jure segregation against Mexican-Americans.

appropriate action under Section 1703(f) which caused a denial of the rights of Mexican-American LEP students thereunder.

        b. Results Prong

Under the results prong, this court must determine whether defendants' program, "after being employed for a period of time sufficient to give the plan a legitimate trial, [failed] to produce results indicating that the language barriers confronting students are actually being overcome," and thus, "no longer constitute[s] appropriate action." Castaneda, 648 F.2d at 1010. Under this prong, the district court determined that the evidence presented—including drop-out rates, retention rates, and the achievement scores of LEP secondary students—indicated widespread program failure. Further, the court held that the totality of this data conclusively proved that defendants' failure to effectively monitor LEP programs caused such LEP secondary student failure at the ground level. We disagree.

To begin with, we note that, statewide, the total secondary school LEP population is only some twenty percent of the total LEP student population.

This court does not dispute that secondary LEP student performance data is alarming. It is clear that LEP students at all secondary grades are not performing satisfactorily on TAKS, and the performance data indicate significant achievement gaps as compared to passage rate targets—roughly falling anywhere between a thirty-five to forty-five percent gap in achievement. This court is further concerned that there is little evidence that these gaps are steadily decreasing over time or that secondary LEP students are showing signs of steady improvement on standardized tests.

But in spite of these real concerns, we find that the district court over-emphasized the significance of student achievement scores. As mentioned previously, it is difficult for standardized tests administered in English to

25

accurately capture an LEP student's knowledge of core curriculum. And, "[i]t is inevitable that [LEP] students (who by definition are not yet proficient in English) will underperform as compared to native speakers." Horne, 129 S.Ct. at 2603 n. 16. See also Castaneda, 648 F.2d at 1014. Last, the system is incapable of crediting high-performance by non-native speakers who have already completed the program because they are no longer classified as LEP.[22] Thus, it is unsurprising that the achievement scores of secondary LEP students illustrate a significant gap in achievement.

Further, the district court's analysis of student achievement data was not restricted to the longitudinal data derived from the PBMAS system. Instead, the district court reviewed data over a period of four years, from the 2003–2004 school year to the 2006–2007 school year, even though the PBMAS system was not implemented until the 2004–2005 school year, and data from the 2006–2007 school year was not in evidence. Thus, only two-years worth of PBMAS data was properly in evidence and before the court.

We find this period of time insufficient to show whether defendants' use of PBMAS enables them to effectively monitor LEP programs and ensure EEOA compliance. See Castaneda, 648 F.2d at 1010 (explaining that LEP programs must be given a "sufficient" period of time to work). The court failed to analyze longitudinal data provided during the time when PBMAS was in effect; thus, the comparisons made, and conclusions reached in making them, are unreliable. Horne, 129 S.Ct. at 2603 n. 16. ( "[An] absence of longitudinal data in the record

---

[22]Yearly in every grade (at least at and/or above grade 3) LEP students are tested in English language proficiency tests and those who are scored "advanced high" are thereafter no longer classified as LEP. Thus, it is virtually inevitable that the higher grades will tend to have a lower proportion of students whose natural talent is above average at least in the ability to learn a language other than that in which they communicated prior to entering school.

precludes useful comparisons."). Due to PBMAS's nascent development and the absence of longitudinal data, we find that the district court abused its discretion in concluding that the PBMAS system had not achieved satisfactory results.

We also take issue with the district court's conclusion that the "totality of [the] data establishes causation."[23] LULAC IV, 572 F. Supp. 2d at 779, 779–80. Included in the "totality of data" were comparisons of the achievement scores discussed above as well as drop-out rates, retention rates, and participation rates in advanced courses. For example, the district court found that in 2003–2004, 2.0% of secondary LEP students dropped out of school, while only 0.9% of secondary non-LEP students dropped out. The district court also pointed out that in 2003–2004, the retention rate of secondary LEP students was 13.8%, while only 6.3% of non-LEP students were retained. And the trial court determined that LEP students are far less likely to participate in a dual enrollment, advanced placement, or international baccalaureate program, e.g., in 2004, 8.5% of LEP students, compared to 19.9% of all students, completed a

---

[23]The district court held that its previous order erred in reading "extraneous causation" into Castaneda's three-part test and erroneously determined that aggregate student performance data, without more, could not evidence the requisite degree of causation:

> "This Court . . . misstated the factual record because Intervenors presented much more than 'aggregate student performance data.' Secondary LEP students across the board not only failed to perform at the level of their non-LEP peers on achievement tests, but also dropped out of school at significantly higher rates; had significantly higher retention rates; and remained in LEP programs for four or more years, without making adequate yearly progress. That the Court did not consider the multitude of indicators in its finding of fact was error in itself; that the Court amplified this error by misstating that Intervenors had presented only a paucity of evidence was . . . clear and manifest reversible error . . . . Examining such nebulous factors as social and economic background as potential primary causes of LEP student failure is a task fraught with hazard."

LULAC IV, 572 F. Supp. 2d at 773.

dual enrollment course.

The above comparisons have little significance. First, these comparative factors suffer the same faults as student achievement scores—the data was collected prior to PBMAS implementation, and because the system was implemented only for the 2004-2005 school year, the comparative factors are not based on longitudinal data. Second, a 1.1% difference in the drop out rate between LEP and non-LEP students is not significantly probative. And though the retention rates show a more significant gap, it is foreseeable that LEP students would have greater difficulty in mastering core curriculum while simultaneously trying to achieve English proficiency. Last, the rate of LEP secondary student participation in advanced courses is of little probative value—it is to be expected that those students still attempting to achieve English proficiency are not as likely to take part in advanced courses.

More significantly, the totality of the data does not explain how the "failure" of LEP students was caused by errors or omissions on the part of TEA. To find a violation of the EEOA, a court must make sufficient findings of fact to support a conclusion that student failures "stem from [defendants'] failure to take 'appropriate action.'" Horne, 129 S.Ct. at 2605. The evidence in this case, which essentially is only comprised of statewide aggregate student performance data and participation rates, cannot support such a causal connection.

Under Texas law the school districts are the ones having "the primary responsibility for implementing the state's" bilingual and ESL programs, TEX. EDUC. CODE § 11.002 (emphasis added), and the boards of trustees of such districts have "primary responsibility for ensuring the district . . . complies with all applicable requirements of state educational programs." Id. § 7.028(b). Further, each school district determines whether ESL or bilingual programs (or other transitional language instruction) are used in the seventh and eighth

28

grades. Id. § 29.053(d)(2). There is essentially no evidence, findings or analysis of the performance of any individual school districts or any groups of districts (whether grouped geographically, or by either overall and/or LEP student population size, or by some socio-economic criteria, or on any other basis), or of the presence or absence or the extent or nature of differences in performance of LEP students (or students as a whole), or the nature of the bilingual or ESL programs and the implementation thereof, as between different districts, or groups of districts, or the like.[24] There is simply no substantial evidence that diverse implementation deficiencies in numerous different school districts did not primarily cause the poor performance of so many secondary LEP students.

Moreover, the district court erred in failing to consider other possible causes for the secondary LEP student failure. See, e.g., note 22, supra. The district court did not explore alternative causes because it concluded that primary and secondary LEP students suffer similar socio-economic conditions, but show significantly different levels of achievement; thus, "social and economic factors . . . are not the culprit." LULAC IV, 572 F. Supp. 2d at 780. The trial court provided no additional evidence to support its assumption.

While we agree that primary and secondary LEP students in a given school district likely exist in similar social and economic situations, we do not believe they are exposed to the same challenges. For example, the Supreme Court recently recognized that secondary LEP students face a greater number of obstacles:

> "There are many possible causes for the [under-]performance of students in [LEP programs]. These include the difficulty of teaching English to older students (many of whom, presumably, were not in

---

[24]Apart from that relating to the percentage rate of parental denials in certain districts. See opinion below, 572 F. Supp. 2d at 737-38.

> English-speaking schools as younger students) and problems, such as drug use and the prevalence of gangs."

Horne, 129 S.Ct. at 2605 n. 20.[25] Thus, any comparison between LEP and non-LEP students "must take into account other variables that may explain [their differences in achievement]" in order to accurately determine the true cause of student failure. Id. The district court abused its discretion in failing to address other possible causes of student failure.

In light of the above errors, we hold that the evidence relied upon by the district court does not establish that TEA has failed to take "appropriate action" to overcome language barriers nor does it establish that TEA has somehow abdicated responsibility in monitoring the secondary LEP program. Nonetheless, we recognize that LEP student performance is alarming, and we encourage the district court and the parties involved to reconsider whether one or more individual school districts should be added to this litigation in order for it to proceed (with transfer to the proper district and division as appropriate). By adding individual districts, the court can better examine the circumstances of specific students, schools, and districts, which will be invaluable evidence for determining the cause of LEP student failure and how best to remedy it.

We do not suggest that state defendants cannot be held liable under the EEOA. Instead, we merely hold that an appropriate analysis of an EEOA claim should be conducted with regard to a particular district or districts, with state educational agencies serving as additional parties.[26]

---

[25]This court notes that a significant difference between primary and secondary students is their ability to obtain gainful employment. Secondary students who are able to alter their economic position through employment will invariably have less time to devote to their studies and may feel added pressure to drop out of school altogether.

[26]Castaneda offers just such an example, where plaintiffs appropriately initiated an EEOA action against a local school district and later named the TEA as a defendant. See

30

E.  Motion to Modify the Modified Order

This court reviews the district court's order granting in part, and denying in part, defendants' motion to modify the order, pursuant to Federal Rule of Civil Procedure 60(b)(5), for abuse of discretion.  Frazar v. Ladd, 457 F.3d 432, 435 (5th Cir. 2006).  Federal Rule of Civil Procedure 60(b)(5) provides that a party may obtain relief from a court order when "applying it prospectively is no longer equitable."  The party seeking to modify an injunction bears the burden of establishing that a significant change in factual conditions or the law warrants revision of the injunction.  See Rufo v. Inmates of the Suffolk County Jail, 502 U.S. 367, 383–84 (1992).

Defendants argue that this court's decision in Samnorwood Independent School District v. Texas Education Agency, 533 F.3d 258 (5th Cir. 2008), constitutes a significant change in the law and requires this court to limit the reach of the Modified Order to the nine all-black school district defendants in the original lawsuit.  In Samnorwood, two school districts that voluntarily desegregated in the 1960s and were not party to the original 1970 litigation challenged whether the Modified Order could be appropriately applied to them.  This court held as follows:

> "[T]he prophylactic provisions created by the Modified Order to remedy the segregative conduct on the part of TEA and all-black schools in East Texas should not be imposed on these two panhandle school districts that had long previously already desegregated and have never since been found to have acted with segregative intent."

Id. at 269.  Central to the court's analysis was the fact that there had been no showing of a constitutional violation by the school districts themselves, and "the modified order and TEA's actions pursuant to it constitute a remedy that must

648 F.2d at 992.

flow from a constitutional violation." Id. at 268, 267–68.

The trial court read Samnorwood very narrowly, determining that this Court's decision was largely based on the fact that the two school districts involved had been unitary prior to the implementation of the Modified Order. LULAC V, 2008 WL 5334404 at *5. Ultimately, the district court modified the order in a very restrictive manner, exempting only those districts situated almost identically to the Samnorwood districts. We find that this modification was overly restrictive.

The Modified Order was issued for the purpose of eliminating the diverse continued local practices and vestiges of de jure racially segregated public education.[27] Since its issuance, nearly forty years have elapsed, and "the racial composition of public schools in Texas has changed drastically." See United States v. Texas, 457 F.3d 472, 475 (5th Cir. 2006). And while this court recognizes that some local vestiges of discrimination and segregation might still remain, it is clear that the Modified Order certainly has, at best, "dwindling relevance." Id.

In light of the above, and this court's supervisory powers, we hold that the Modified Order's reach should be further limited. Related concerns led us to modify the original order on direct appeal to provide that "[no]thing herein shall be deemed to affect the jurisdiction of any other district court with respect to any presently pending or future school desegregation suits." United States v. Texas,

---

[27]This court, of course, recognizes that de jure racial discrimination existed in Texas. We also note that in 1955 the Texas Supreme Court declared invalid, under the United States Constitution, the provisions of the Texas Constitution and statutes requiring school racial segregation, McKinney v. Blankenship, 282 S.W.2d 691, 695 (Tex. 1955), and that in 1969, the Texas Legislature formally repealed all of the State's segregation laws. Acts 1969, 61st Leg., p. 3230, H.J.R. 3. Thus, the original 1970 litigation was brought at a time when segregation was invalid under both federal and state law.

447 F.2d 441, 442 (5th Cir. 1971). See also, e.g., United States v. Texas, 466 F.2d 518, 519 (5th Cir. 1972) (transferring case as to San Felipe Del Rio School District to Western District of Texas). Time has shown that further restriction of the modified order's scope is necessary and appropriate. See, e.g., Samnorwood, 533 F.3d at 269; Gregory-Portland, 654 F.2d at 993-94. The district court was correct to exempt school districts similarly situated to the Samnorwood districts. In addition, we find that the same modification must be made for local school districts declared unitary in federal cases; school districts currently under federal court desegregation orders or decrees or which are parties to pending federal court desegregation suits; and any other specific school district not a party to the case when the Modified Order was issued which requests, or for which the State requests, exemption from the Modified Order unless a plaintiff shows the district is not then unitary. As to such districts that are thus now or subsequently exempted from the Modified Order, the district court may no longer direct TEA with regard to such districts pursuant to its remedial jurisdiction over the Modified Order.[28]

## IV. CONCLUSION

We hold that the district court abused its discretion in finding that defendants' violated Section G of the Modified Order because there was no sufficient evidence or finding of statewide de jure segregation against Mexican-Americans. We also hold that the district court abused its discretion in holding that defendants violated Section 1703(f) of the EEOA because the evidence presented does not establish that a student's right has been violated or that defendants' acts or omissions caused any claimed violation. On remand, we

---

[28]And such districts shall no longer be subject to the district court's continuing jurisdiction under the Modified Order.

33

instruct the court below to reconsider whether local school districts should be added to this action, and upon the inclusion of a local school district, we instruct the court below to reconsider whether it constitutes an "appropriate district court" for jurisdictional purposes, or if, instead, the litigation should proceed in a different forum appropriate to such school districts under normal venue principles.

REVERSED and REMANDED.